642 P.2d 553

**IDAHO FALLS CONSOLIDATED HOS-
PITALS, INC., an Idaho corporation,
Plaintiff-Respondent,**

v.

**BINGHAM COUNTY BOARD OF
COUNTY COMMISSIONERS,
Defendant-Appellant.**

Nos. 13772, 13882.

Supreme Court of Idaho.

March 12, 1982.

Colin W. Luke, Deputy, Bingham County Pros. Atty., Blackfoot, for defendant-appellant.

C. Timothy Hopkins, of Hopkins, French, Crockett & Springer, Idaho Falls, for plaintiff-respondent.

DONALDSON, Justice.

On May 9, 1979, Juan Jose Ortiz and Leobardo Ortis Ramos were involved in an automobile accident. The respondent, Idaho Falls Consolidated Hospitals, Inc., provided medical services costing $4,175.16. At the time of the accident both parties maintained a residence in Bingham County but were indigent and unable to pay for the medical expenses.

The hospital filed applications on behalf of the patients with the appellant, Bingham County Board of County Commissioners, seeking payment for medical services under the Idaho Medical Indigency Act.[1] The

---

1. The pertinent provisions of the Act are:

I.C. § 31-3501. "Declaration of policy.—In order to safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state, and, in the case of indigent persons, to provide for the payment thereof, the respective counties of this state shall have the duties and powers as hereinafter provided."

I.C. § 31-3503. "Powers and duties of boards of county commissioners.—The boards of

county commissioners in their respective counties shall, under such limitations and restrictions as are prescribed by law:

(1) Care for and maintain the medically or otherwise indigent, and may provide for the care of other sick persons as provided in section 31-3514, Idaho Code, and for this purpose said boards are authorized to levy an ad valorem tax not to exceed five (5) mills on the dollar on all taxable property in the county."

I.C. § 31-3508. "Amount of aid for hospitalization.—The county responsible for payment

Board denied the hospital's application on the basis that the two indigents were illegal aliens.

This decision was appealed by the hospital to the district court on the grounds that the denial of the application was in violation of the Equal Protection Clause of the Fourteenth Amendment. It was also asserted that the federal government had preempted the area of law covering all aliens.

Without reaching the constitutional or the preemption issues, the district court ruled in favor of the hospital. Bingham County was ordered to grant the application filed by the hospital for county medical aid.

Subsequent to that decision Bingham County moved the district court to reconsider its decision for the reason that the Idaho Medical Indigency Act was in violation of Article 8, § 4 and Article 12, § 4 of the Idaho State Constitution.[2] The court granted the motion because of the importance of the constitutional issue.

The two parties submitted briefs and the district court again ruled in favor of the hospital. The court found that the provisions of the Act were not barred by the Idaho State Constitution. This appeal followed.

▮ The trial court found that the Act was constitutional because it served a public purpose. It appears from this finding that the trial court applied the criteria used to determine the constitutionality of an act which imposes financial liability upon the state rather than a county or municipality. Concerning an act which imposes financial liability upon the state, this Court has held that under article 8, § 2, "no entity created by the state can engage in activities that do not have primarily a public rather than a private purpose, nor can it finance or aid any such activities." *Board of County Commissioners v. Idaho Health Facilities Authority*, 96 Idaho 498, 502, 531 P.2d 588, 592 (1975). However, article 8, § 4, specifically forbids counties from loaning or giving credit "for any purpose whatever." Therefore, the fact the Act in this case serves a public purpose is not enough in itself to uphold its constitutionality. *Fluharty v. Board of County Commissioners*, 29 Idaho 203, 158 P. 320 (1916). However, even though the trial court misapplied the law, where an order of the lower court is correct but based upon an inapplicable rule of law, the order will be affirmed upon the correct rule of law. *Foremost Insurance Co. v. Putzier*, 102 Idaho 138, 627 P.2d 317 (1981).

▮ Bingham County maintains that this Court in *Fluharty, supra,* interpreted the Idaho State Constitution to prohibit a county from appropriating money to a private entity that results in giving or loaning credit directly or indirectly to a political body. Following this case Bingham County argues that the statutory scheme in question violates the Idaho State Constitution because the hospital is a private entity and the Idaho Medical Indigency Act requires Bing-

---

shall pay regular hospital charges for the hospitalization of a medically indigent person to the hospital rendering such services. The bill submitted for payment pursuant to section 31–3405, Idaho Code, shall show the total hospital charges less any amounts which have been received under any other federal or state law. Bills of less than twenty-five dollars ($25.00) shall not be presented for payment."

2. Art. 8, § 4: "County, etc., not to loan or give its credit.—No county, city, town, township, board of education, or school district, or other subdivision, shall lend, or pledge the credit or faith thereof directly or indirectly, in any manner, to, or in aid of any individual, association or corporation, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state."

Art. 12, § 4: "Municipal corporations not to loan credit.—No county, town, city, or other municipal corporation, by vote of its citizens or otherwise, shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for, or make donation or loan its credit to, or in aid of, any such company or association: provided, that cities and towns may contract indebtedness for school, water, sanitary and illuminating purposes: provided, that any city or town contracting such indebtedness shall own its just proportion of the property thus created and receive from any income arising therefrom, its proportion to the whole amount so invested."

ham County to loan its credit to the hospital corporation and also requires the county to become responsible for the debts of indigent persons.

Bingham County also argues that following an 1877 Pennsylvania case cited in dictum in *Fluharty, supra,* the statute has to be found unconstitutional. The Pennsylvania case involved a similar statute and constitutional provision and the Pennsylvania Supreme Court found the statute unconstitutional. However, we cited this 1877 case in dictum and as this Court has previously stated, "To get the rule applicable to the construction of our Constitution it is not necessary to go into other jurisdictions . . . ." *Higer v. Hansen,* 67 Idaho 45, 63, 170 P.2d 411, 422 (1946).

In *Engelking v. Investment Board,* 93 Idaho 217, 458 P.2d 213 (1969) this Court also stated that "[t]he fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers[,] and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it." *Id.* at 221, 458 P.2d 213. Therefore, we decline to follow this Pennsylvania case, and instead, will examine the intent of the delegates to the Constitutional Convention in order to determine if they meant to prohibit counties from reimbursing hospitals for the care of indigents. One way to determine their intent is to review the history of the west at the time the Constitution was written. This Court in *Idaho Water Resource Board v. Kramer,* 97 Idaho 535, 560, 548 P.2d 35, 60 (1976) cited a law review article that reviewed the events occurring at the time this constitutional provision was adopted. It stated:

" 'In the nineteenth century, the United States was enjoying a rapid westward expansion. A key element in this expansion was the construction of railroads and other communication and transportation systems, the routes of which vastly influenced growth. An adjacent railroad was often crucial to the economic growth, if not the very existence, of many localities. As a result, state and local governments, in order to encourage specific routes and spurs, offered financial assistance to struggling railroads. This assistance was not entirely without precedent in light of earlier successes with similar projects such as the Erie Canal. Governmental assistance usually took the form of stock or security purchases, or co-signatures on bonds issued by railroads. Since these private ventures were at best highly speculative, many failed, leaving governmental units, and thus the taxpayer, either holding worthless stock certificates or, even worse, liable for large inadequately secured debts. During the depression of 1837 nine states defaulted on, or repudiated, debts of this type. These repudiations were made easier because a significant portion of the debt certificates were held by European investors who desired a stake in the American adventure.

" 'The resulting economic crisis led to the passage of constitutional provisions designed to limit state indebtedness and restrict governmental involvement in private ventures. Forty-five state constitutions contain provisions prohibiting the lending of credit; . . . ' " Comment, *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis,* 41 U.Colo.L.Rev. 135, 136 (1969).

Another method used to determine the intent of the delegates is to consider the proceedings at the constitutional convention. Considering these proceedings allows this Court "to interpret the applicable provisions of the Constitution as nearly as possible in a manner consonant with the objects and purposes contemplated by the framers of the Constitution at the time of its adoption." *Idaho Telephone Co. v. Baird,* 91 Idaho 425, 429, 423 P.2d 337, 341 (1967); *Oneida County Fair Board v. Smylie,* 86 Idaho 341, 386 P.2d 374 (1963). The proceedings of the Constitutional Convention set out in Proceedings and Debates of the Constitutional Convention of Idaho 1889, at 597 (I.W.Hart ed. 1912), show that the delegates were concerned about the people of the state becoming burdened with taxes because railroads had induced the

people to vote subsidies to aid in the construction of railroads. One of the delegates, Mr. Sweet from Latah County, stated:

"I would say, Mr. Chairman, in Nebraska and Iowa, in fact in nearly all of the western states, railway corporations and others of that character induced the people of counties and towns to vote subsidies in the way of bonds to aid them in the construction of railroads, until the people of those states became so burdened with taxes that they turned upon all sorts and kinds of indebtedness, and the result has been there has been a great deal of antagonism—

. . . .

"Well, all those states have turned against corporations and the voting of subsidies, and I think they are justly, and I think the example of those states should be a lesson to us to avoid giving permission to municipalities to vote such subsidies; . . ." Proceedings and Debates of the Constitutional Convention of Idaho 1889, at 597 (I.W.Hart ed. 1912).

While discussing article 8, § 4 and article 12, § 4, in *Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 499 P.2d 575 (1972), this Court also recognized the reason behind the adoption of these constitutional clauses.

"The proceedings and debates of the Idaho Constitutional Convention indicate a consistent theme running through the consideration of the constitutional sections in question. It was feared that private interests would gain advantages at the expense of the taxpayers. This fear appeared to relate particularly to railroads and a few other large businesses who had succeeded in gaining the ability to impose taxes, at least indirectly, upon municipal residents in western states at the time of the drafting of our constitution." *Id.* at 883–84, 49 P.2d 575.

Finally, to help determine the intent of the delegates, constitutional provisions must be read in light of the law existing at the time of the adoption of the provision. *Higer v. Hansen*, 67 Idaho 45, 170 P.2d 411

(1946); *See Idaho Mutual Benefit Association, Inc. v. Robison*, 65 Idaho 793, 154 P.2d 156 (1944), (the state of the law at the time the people vote upon a proposed constitutional amendment must be considered). Following this, perhaps even more persuasive in our finding that the framers did not intend to prohibit aid to indigents is that at the time the constitution was adopted counties were authorized to pay for the care of indigents. This act originated in 1887 under R.S. § 2170 and was not repealed when the constitution was adopted, but rather, it was reenacted under R.C. & C.L., § 2137; C.S., § 3722; and I.C.A., § 30–2901. The current Act has been updated and sections have been added, but the substance has remained the same as when it was enacted in 1887.

Because a similar statute was in effect at the time the Constitution was adopted and because of the western states' past experience with railroads, it is apparent that the framers of the Idaho Constitution were primarily concerned about private interests gaining advantage at the expense of the taxpayer. However, that particular evil is not presented by the payment to hospitals for the treatment of indigents because, as shown below, this fund remains within the effective control of the municipality. Remaining within the control of the municipality helps insure that private interests will not gain advantage at the expense of the taxpayer. *See Hanson v. City of Idaho Falls*, 92 Idaho 512, 446 P.2d 634 (1968).

Under the Act an indigent person desiring aid from the county must make a written application to the clerk of the Board of County Commissioners of the county where the applicant resides, I.C. § 31–3404. The clerk of the Board of County Commissioners is then immediately to investigate the grounds of the application and he may require that the person submit to physical and mental examinations and also may require that the person testify under oath, I.C. § 31–3405. The county commissioners grant relief only if in their judgment the applicant is medically indigent, I.C. § 31–3406. Furthermore, the counties are re-

sponsible for only regular hospital charges and hospitals must make all reasonable efforts to determine the liability for the account before attempting to collect from the county, I.C. § 31–3508 and I.C. § 31–3509. Also, upon payment of charges for hospitalization of medically indigent persons, the county making such payment shall become subrogated to the rights of the hospital and to all rights of the medically indigent person against any third persons who may be liable for such hospitalizations, I.C. § 31–3510. Finally, if a person gives any misleading or false information to the hospital he or she shall be guilty of a misdemeanor, I.C. § 31–3511. We find these controls are sufficient to relieve any fears that the county is speculating or incurring losses at the expense of the taxpayer.

A review of the proceedings at the constitutional convention, the history of the west, and a similar statute that was in effect at the time the constitution was adopted, show that the delegates only sought to prevent private interests from gaining advantage at the expense of the taxpayer. Since the fund remains within the effective control of the municipality, it is apparent that the evils sought to be prevented do not exist. Therefore, we find the delegates did not adopt article 8, § 4 and article 12, § 4 to prohibit counties from giving aid to indigents and we hold the act is constitutional. We affirm.

McFADDEN, J., concurs.

BAKES, C.J., and SHEPARD, J., concur in result.

BISTLINE, J., concurs in affirmance of the judgment.

BISTLINE, Justice, concurring in affirmance of the Judgment below.

I.

The Indigent Sick

Until an amendment enacted in 1974, there had not been any great changes in the indigent and medically indigent law since 1887. Tracing the history of the legislation backwards, it is found that in the very early days it was only the indigent sick who were recognized as an obligation of that pioneer society. On December 13, 1864, the territorial governor signed into law an act which had for its purpose "the care, protection, and maintenance of the indigent sick." The act was funded by both a property tax and per capita tax, the revenues from which went into a special fund, payable out on order of the board of county commissioners. An Act to Provide For the Better Maintenance of the Indigent Sick, Idiotic and Insane Persons, In the Several Counties of This Territory, Second Territorial Legislature, 1864 Idaho Sess. Laws ch. 24 at 424.

II.

The Poor, But Not Sick

Nineteen years later, the poor who were not sick were first provided for by the territorial legislature in an act passed and approved on February 8, 1883. The Ada County Commissioners were by it authorized to establish a Poor-farm and house. Section 8 of this Act set out the procedure for gaining admission:

"Any poor person . . . needing aid from the county shall make application . . . to any Justice of the Peace or the Probate Judge . . . The application shall state that the party . . . is indigent, unable to support himself . . . is unsupported by relatives or friends . . . [and] set forth a full description of all property of whatever kind belonging to the party needing the aid." An Act to Provide For the Poor in Ada County, Twelfth Territorial Legislature, 1883 Idaho Sess. Laws 78.

In turn the justice of the peace or probate judge was required to investigate, and when

"fully satisfied that the person needs aid, that he is indigent, unable to support himself, and is unsupported by friends or relatives, and would suffer unless aided by the county, he shall enter up a judgment to that effect and give a certificate to the person needing aid, which shall entitle such person . . . to admission to the county poor-house." *Id.*

Two years after the poor were provided for, the 1864 Indigent Sick Act was amended as of January 30, 1885. The procedure there established for granting assistance to the indigent sick borrowed heavily from the terminology which had been used in the first Poor Act of 1883. Thus:

"Any sick person desiring aid from any county ... shall ... make a -written application to the Probate Judge, the Clerk of the Board of County Commissioners or to any Justice of the Peace ... setting forth and describing [his property] ... shall declare his indigency or destitution...." An Act Supplementary to the Act of 1864, 13th Territorial Legislature, 1885 Idaho Sess. Laws 124, 124.

And, in turn, such officials were required:

"... to immediately investigate the grounds of such application, ... and if such officer is fully satisfied that said applicant is really sick, indigent and in destitute circumstances, and would suffer unless aided by the county, he shall file a certificate to that effect with the Clerk of the Board ..." *Id.*

In 1887, procedures for providing assistance to the poor, and to the indigent sick, were lumped together into one provision of Chapter VI of Title XI of the Revised Statutes, and thus § 2173 was enacted, commencing in this language:

"Any sick or indigent person desiring aid from any county ..."

And § 2174, the investigation and certification section, was accordingly rewritten to read:

"if such officer is fully satisfied that said applicant is really sick, indigent and in destitute circumstances, and would suffer unless aided by the county, he must file a certificate ... and in case said Board of

County Commissioners is not in regular session at the time ... the officer ... may, in his discretion, authorize the applicant to be placed in the *poor-house or hospital of the county*, ..." (Emphasis added.)

So it was poor to the poor-house, indigent sick to the hospital.

Some of these 1887 laws continued in effect without any change for nearly ninety years until substantially amended in 1974. For instance, § 2175, Revised Statutes 1887, was in exactly the same language as I.C. § 31–3406 in the first part of the year 1974:

"That the County Commissioners of such county must, after the filing of the certificate as aforesaid, if in their judgment the applicant is sick *and* indigent, and would suffer if not aided by the county, make such provisions for his relief as may be necessary under the circumstances." (Emphasis added.)

### III.

### The Injured Indigent

The law from 1887 on, and which in 1956 was I.C. § 31–3407, precluded the commissioners from allowing a claim where the certification had not been previously obtained. This limitation led to the passage of Chapter 168, 1957 Idaho Session Laws, whereby provision was made for allowing hospitals to render services to an indigent sick person *in an emergency*, and yet recover payment where the certificate was subsequently obtained. Emergency services were defined to be those reasonably necessary to alleviate illness *or injury* which if untreated would be apt to maim or cause death.[1]

---

1. "AN ACT

AMENDING SECTION 31–3407, IDAHO CODE, RELATING TO PAYMENT FOR CARE OF THE INDIGENT SICK RENDERED IN AN EMERGENCY BY LICENSED HOSPITALS, DEFINING EMERGENCY, AND FIXING LIABILITY BETWEEN COUNTIES.

Be It Enacted by the Legislature of the State of Idaho:

"Section 1. That Section 31–3407, Idaho Code, be amended to read as follows:

"31–3407. CERTIFIED CLAIMS ONLY TO BE ALLOWED.—The county commissioners must not allow any claim or demand against the county for services rendered to any sick or indigent person who has not previously obtained from the probate judge, clerk of the board of county commissioners, or justice of the peace, as aforesaid, the certificate heretofore mentioned and must not allow any claim or de-

## IV.

### Medically Indigent Redefined

As earlier mentioned, the law governing assistance to the sick was overhauled in 1974. Chapter 34 had already had poured into it the processing of applications for relief of both the poor and the indigent sick. Thus I.C. §§ 31–3404 and –3405 (the application and investigation provisions) formerly spoke respectively of "sick or indigent persons," and of those "really sick, indigent and in destitute circumstances." In 1974, these already over-crowded statutory provisions were blessed with the addition of a new class, called the "medically indigent." *See* 1974 Idaho Sess. Laws ch. 302 at 1769. The result was this I.C. § 31–3405 certification language:

"[I]f such officer is fully satisfied that the person is medically indigent, or sick, or otherwise indigent and in destitute circumstances, that there is no work available to him which he is mentally and physically capable of performing, and would suffer unless aided by the county, he must file a certificate to that effect with the board of county commissioners of such county. . . ."

Other than this original application processing, however, the law governing the "medically indigent" was to be found by turning over to the new Chapter 35. The legislative revision of 1974 repealed the former Chapter 35 in its entirety, but re-enacted in almost identical language all of its former provisions dealing with the funding, building and management of county hospitals. The remaining changes made clear the intent of the legislature to provide assistance for the "medically indigent," that is to say, for those who are made indigent by catastrophic medical bills, whether from illness or from injury, or other cause, such as premature birth. *See University of Utah Hospital and Medical Center v. Bethke*, 101 Idaho 245, 611 P.2d 1030 (1980).

The revenue section, former I.C. § 31–3501, which had its origin in Sections 1 and 2 of the 1864 Act to provide for the care of indigent sick, now became I.C. § 31–3503, with this change:

Prior to 1974 the section provided:

"To care for and maintain the indigent sick or otherwise dependent poor, aged and infirm of the county . . ."

The 1974 revision provided:

"Care for and maintain the medically indigent, sick or otherwise indigent persons of the county . . ."

Thus, the revenue section now included and was clearly intended to benefit "the medically indigent."

As already noted, the legislature had previously determined back in 1957 that indigent sick persons would receive hospital services in emergency situations, and the 1974 amendments continued to recognize this, although doing so under the terminology of "acute" cases of surgery, illness, and obstetrics where there could be no time taken out for the processing of an application.

mands whatsoever against the county for any expense incurred by, or in behalf of, any sick or indigent person before the filing of the application and certificate aforesaid; provided, that the board of county commissioners, or, if such board be not then in session, any member thereof, by written order to be filed with the clerk of said board, may authorize the expenditure of not to exceed fifty dollars, in the aggregate, to provide for the immediate necessities of any indigent person where, in the opinion of said board of commissioners, or the member so making said order, it is proper so to do rather than send such person to the poor farm or hospital*; *Provided further that a claim against the county shall be allowed for services rendered prior to obtaining the certificate here-* *tofore mentioned where a licensed hospital renders the services to an indigent sick person in an emergency and subsequently there is obtained said certificate heretofore mentioned. Services rendered in an emergency are defined as those reasonably necessary to alleviate illness or injury which if untreated is apt to maim or cause death. Such services shall be paid for by the county of residence of the indigent sick and, if not a resident of Idaho, by the county wherein the indigent sick became ill or was injured. Bills for such expenditures, duly verified under oath, must be presented to said board and the board must audit and pay such bills out of the proper fund of such county, at their next regular meeting."* Idaho Sess. Laws ch. 168 § 1, pp. 303–304.

Note, too, the text of I.C. § 34–3404 as rewritten in 1974. Prior to 1974, a written application was required by the sick person, or the indigent person, desiring aid. This was unchanged by the 1974 amendment. Similarly, the amendment provided the requirement of a written application by a medically indigent person. A distinction, however, was that I.C. § 34–3404, as amended in 1974, set forth the form of application which the counties could use. This form required a sworn statement that the patient "is a medically indigent person as defined in section 31–3502, Idaho Code." The same sworn statement required a declaration of the patient's real personal assets, and average monthly income. This dovetails with the mention of "average monthly income" which is a keystone of the statutory definition of a medically indigent person in I.C. § 31–3502(1). Conversely, a person with assets and a monthly income would rarely be able to swear that "there is no work available to him which he is mentally and physically capable of performing." For this reason, the 1974 amendment omitted any such requirement in the application form it recommended for adoption by counties.

A considered review of the history of the legislative scheme thus leads to the inescapable conclusion that the legislature in 1974 created the class of "medically indigent," and that this classification is wholly independent and separate from the indigent sick, and from the otherwise poor or indigent. What is learned from the review is that it has always been the sense of the people of Idaho, speaking first through their territorial legislatures, then through their Constitutional delegates, and since 1889 through their state legislatures, that medical care and necessities of life will not be denied to those unfortunate few who would suffer and sometimes perish if the same were not provided by the largess of the people acting through their government, which taxes for that very purpose.

**2.** The footnote to the opinion is in error as to the first enactment of the legislature providing counsel to the indigent accused. I.C. §§ 19–

V.

## The Indigent Accused, and, If a Minor, His or Her Indigent Parents

Just two years ago this Court had occasion to rule on the legislature's statutory scheme for payment of attorney's fees with public monies. In the case of *In the Interest of Dunmire,* 100 Idaho 697, 604 P.2d 711 (1979), a child of 14 years charged with certain offenses within the purview of the Youth Rehabilitation Act (YRA), was provided with counsel in accordance with YRA requirements. Pursuant to the YRA, upon request of the child's indigent mother the mother was also furnished counsel. The opinion of the Court, noting that YRA proceedings are quasi-criminal in nature, commented [2] that it has been the policy of the people since 1897, in which year was enacted the provision that no person should be tried on a felony charge without being provided with counsel, to furnish counsel to an accused who is unable to furnish his own because of his poverty. S.L. 1897, p. 74, § 6; former I.C. § 19–1513 (repealed in 1967 in favor of present statutory scheme— see 1967 Idaho Sess. Laws ch. 181, § 21).

As noted in *Dunmire,* the pecuniary inroad upon the public treasury initially was not great, as counsel in murder cases received only $50.00, and $25.00 was the statutorily set fee for all other felonies. The 1937 legislature, although in the midst of the Great Depression, amended the law to grant as recompense to appointed counsel a sum deemed reasonable by the district judge.

In 1967, followed by amendments in 1968 and 1972, the law was changed so as to provide counsel for "serious crimes"—which in addition to felonies included misdemeanors where there was a possibility of confinement for more than six months or a fine in excess of $300.00. 1967 Idaho Sess. Laws ch. 181, § 1 (*codified at* I.C. § 19–851).

851 through –865 now declare the statutory law for providing appointed counsel.

## VI.

### The Constitution

The Framers of the Constitution, in proposing it to the people for ratification, prefaced it with as clear a statement of purpose and intent as might be made, which included as applicable here, *the promotion of our common welfare.*

Against this constitutional backdrop and over a century of territorial and state legislation whereby the people themselves, through their legislature have spoken to the principle, this Court is now for the first time ever asked to hold that legislation providing medical care for the medically indigent violates Article 8, section 4 and Article 12, section 4 of our Constitution, both of which provisions are set forth in the Court's opinion in footnote 2.

The legislature, in extensively amending the previous indigent sick and poor laws so as to create the class of "medically indigent,"[3] which the legislature itself defined, quite obviously thought itself to be acting in the promotion of *our common welfare*, as that term is used in the Preamble to our Constitution. At a glance it is observed that this is beyond dispute. I.C. § 31–3501, which is the declaration of purpose of the act of 1974, provides:

> "In order to safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state, and, in the case of indigent persons, to provide for the payment thereof, the respective counties of this state shall have the duties and powers as hereinafter provided."

The legislature continued to recognize the powers which the county commissioners had long possessed, and their concomitant duties, when I.C. § 31–3502 was amended in 1974, and again in 1980.

Upon what basis, then, is there any plausible argument that article 8, section 4, and article 12, section 4, of the Constitution have been violated? I find none. Both of those provisions were clearly aimed at prohibiting the counties from venturing into a forbidden area. More than that, the only language in either provision which might have any applicability is that in article 8, section 4, which states that the county shall not "become responsible for any debt, contract or liability of any individual. . . ."

The argument here made is that a county paying the hospital bill of a "medically indigent" person is responsible for that person's debt. I do not see this as merchantable argument. The statutory scheme now is, and has long been that, other than in cases of emergency, application for relief must first be made to the county. When relief is granted, it is in the form of an order, and the order is simply that the county, playing its part in the promotion of our common welfare, takes some of the money which it has collected through taxation, and purchases for the unfortunate indigent that which he must have and is unable to purchase for himself, i.e., groceries, fuel, medical and hospital services, and in the other field I have mentioned, legal services, where he has been named as an accused. It is a clear application of the doctrine of parens patriae, and clearly within the contemplation of our Idaho Constitution as well as most civilized societies.

I see no scintilla of any violation of the two constitutional provisions. I do feel, and have so felt for some time, that the legislature should augment the statutory provisions with a pooling of revenues by the 44 counties so that in a given year, counties which have little or no medically indigent bills to pay would share the burden of others which were hit extremely hard—for instance, ponder upon the doctor and hospital

---

**3.** "Medically indigent" is defined as:

"any person who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services." I.C. § 31–3502(1).

"Indigent" is defined as:

"any person who is destitute of property and unable to provide for the necessities of life." I.C. § 31–3502(7).

bills which would accrue if a truckload of migrant farm employees overturned.

## VII.

### The District Court Decision Was Sound

Finding no fault in what the Court's opinion sees as the objective of article 8, section 4, and article 12, section 4, I simply do not see that those provisions have any applicability to the statewide scheme enacted by many legislatures, over many years, for the promotion of our common welfare. At the same time, I am much impressed with the sound logic in this case of Judge Beebe, who, I surmise, relied upon an earlier constitutional discussion written by Judge W. E. Smith in a similar case in Ada County. Judge Beebe wrote in part:

"The granting of aid to the indigent poor so that they can receive medical care is a governmental function tending to promote the general welfare. *See Henderson v. Twin Falls County*, 56 Idaho 124, 139, 50 P.2d 597 (1935). The purpose of the Idaho Medical Indigency Statutes is clearly public in character. In the present case, the county is disbursing county public funds for a public purpose, i.e., to make health care available to the public, because of inability to pay and thereby 'safeguard the public health, safety and welfare.' The court holds that the statutes of the Act requiring the county to make payments on behalf of indigent persons without reference to whether such payments will be made to a private association or corporation do not violate Article XII, Section 4 of the Constitution. Therefore, the court ORDERS that respondent grant the applications of the applicants filed by appellant for county medical aid as allowed by the statutes."

Judge Smith, in his consideration of the same question, in *St. Luke's Hospital v. Board of County Commissioners of Ada County*, Civ.No. 64483 (1979) also dealt with it in short order:

"[The] legislative declaration of public purpose is entitled to the utmost consideration, even though it is not binding and conclusive upon the question of public purpose. *Board of County Commissioners v. Idaho Health Facilities Authority*, 96 Idaho 498, 500, 531 P.2d 588 (1975); *Village of Moyie Springs, Idaho v. Aurora Manufacturing Co.*, 82 Idaho 337, 348, 353 P.2d 767 (1960).

"In *State v. Lindstrom*, 68 Idaho 226, 232, 19 P.2d 1009 (1948), the Idaho Supreme Court said that the granting of aid to its needy aged is a well recognized function tending to promote the public welfare. The Court in that case said:

'Thus, its character as to all eligible receipts having been determined to be public rather than private it follows that the granting of such aid is not within the constitutional inhibitions unless the recovery features of the law above quoted made the law subject to inhibitions. * * * (cites omitted) Undoubtedly the state has authority to provide for public assistance for its needy aged, and the governmental nature of the service determines its character as not giving or loaning the credit of the state. 68 Idaho at 232 [19 P.2d 1009.]'

"Likewise, it has been judicially stated that the granting of aid to the indigent poor so that they can receive needed medical care is a governmental function tending to promote the general welfare. As long ago as 1935, Justice Ailshie announced in *Henderson v. Twin Falls County*, 56 Idaho 124, 139, 50 P.2d 597 (1935) that 'it is the *duty* of the county to take care of the indigent sick and otherwise dependent poor.' (Emphasis added in original.)

"The primary purpose of the statute is to make health care available to the public, regardless of ability to pay. Any incidental benefit to profit-making enterprises will not invalidate the program. Only if private interests are primarily benefitted, must such programs with public goals be invalidated. See *Board of County Commissioners v. Idaho Health Facilities Authorities*, 96 Idaho 498, 502, 531 P.2d 588 (1975).

"The Court concludes that the purpose of this act is public in character and can readily be distinguished from those functions and purposes which are private in character and engaged in for private profit. See *Hanson v. City of Idaho Falls,* 92 Idaho 512, 446 P.2d 634 (1968). As such, the statute, is not unconstitutional."

### VIII.

#### Vote to Affirm

I would affirm the judgment of the Court below and uphold its legal conclusions as well, allowing attorney's fees and costs of appeal as being within the statutory mandate.