750 P.2d 950

Debra SAXTON, Plaintiff–Appellant,

v.

GEM COUNTY; and Dorothy Hartgrove, W.M. Norwood, and William Conrad, in their official capacities as the Board of County Commissioners of Gem County, Defendants–Respondents.

No. 16636.

Supreme Court of Idaho.

Feb. 18, 1988.

Idaho Legal Aid Services, Inc., Caldwell, for plaintiff-appellant. Andrew C. Thomas, argued.

Moffatt, Thomas, Barrett & Blanton, Boise, for amicus curiae St. Luke's Regional Medical Center and St. Alphonsus Regional Medical Center. Phillip S. Oberrecht, argued.

Hopkins, French, Crockett, Springer & Hoopes, Idaho Falls, for amicus curiae University of Utah School of Medicine. Larry L. Goins, argued.

Gem County Prosecuting Atty., Emmett, for defendants-respondents. H. Ronald Bjorkman, argued.

Anderson, Pike & Bush, Idaho Falls, for amicus curiae Catastrophic Health Care Costs Program of the Idaho Counties. Blake G. Hall, argued.

BAKES, Justice.

The appellant, Debra Saxton, appeals a district court decision which held that Gem County is not statutorily required under Idaho's medical indigency statutes to pay physicians' bills incurred by a medically indigent patient in the context of emergency hospitalization. The facts show that Debra Saxton was suffering an acute psychotic episode and was admitted to St. Alphonsus Regional Medical Center through the emergency ward. After her release Saxton filed an application for county assistance with Gem County on January 14, 1985. The application requested: (1) payment for the hospital bill incurred for the treatment at St. Alphonsus for hospitalization from December 31, 1984, to January 14, 1985, in the amount of $4,266.89, and (2) payment of her physician's bill resulting from the hospitalization in the amount of $955.00. The physician was not an employee of St. Alphonsus, but has staff privileges and was Saxton's attending physician during her hospitalization. Gem County denied the application, and Saxton requested a hearing. Saxton represented herself *pro se* in a hearing held March 11, 1985.

Gem County issued a written decision denying appellant assistance for three reasons: (1) appellant had not received "emergency" care; (2) Saxton's application for Social Security benefits might be a resource available to pay the bills; and (3) Gem County was not the obligated county because Saxton had not resided in Gem County for six months prior to her application.

With the assistance of counsel, Saxton filed a request for rehearing April 22, 1985. The request for rehearing was denied on May 1, 1985, and appeal was taken to the district court pursuant to the Idaho Admin-

istrative Procedures Act. A motion to submit additional evidence, pursuant to I.C. § 67–5215(e), was filed on July 9, 1985, and the motion was granted and the matter remanded to the county commission.

A second hearing was held before Gem County on December 30, 1985. At that time testimony from Saxton and eight exhibits were offered on her behalf. On January 14, 1986, Saxton's application was once again denied. However, this time only one reason was given for the denial. Gem County found that Saxton's medical care was not in response to an "emergency or life-threatening" situation.

On January 29, 1986, the district court ordered briefs, along with the production of the transcripts and exhibits. After considering the briefs and the record, the district court issued a memorandum decision ordering the respondents to pay Saxton's hospital bill at St. Alphonsus. The district court: (1) held "the affidavit (of the physician) and medical records in this case make it abundantly clear that appellant's symptomatic behavior constituted an emergency which required immediate attention"; (2) rejected respondents' argument that the state's medical indigency statutes do not provide for treatment of mental illness, but apply only to physical illness or injury; and (3) rejected the claim that Gem County was legally obligated to pay the physician's bill, finding "no authority for payment to private physicians under the medical indigency statutes which authorize payment only to hospitals." Appellant filed a petition for rehearing on the issue of the physician's fees and the petition was granted. After reviewing briefs submitted by the parties, the district court issued a second memorandum decision which reaffirmed the court's prior holding.

Saxton has appealed the district court ruling that Idaho counties are not obligated to pay physicians' bills incurred in the context of emergency hospitalization for a county assistance applicant who is medically indigent. The respondents have not appealed the district court finding that the county was liable for Saxton's hospital bill.

Thus, only the physician's fee issue is before this Court. For the reasons enumerated below, we reverse the district court and hold that Idaho's medical indigency statutes require Gem County to pay the doctor's bill.

The appellant claims that the doctor bills are chargeable to Gem County based upon the Idaho medical indigency statutes, located at chapters 34 and 35 of Title 31 of the Idaho Code. In these sections the legislature has somewhat ambiguously codified the county's duty to care for its medically indigent citizens. A careful reading of the statutes fails to directly answer the physicians' fees question. Thus, we must resolve this question by determining what the legislature intended as it promulgated and modified the statutes. In order to resolve the legislature's intent, we must review the historical development of Idaho's indigency statutes. As Justice Holmes once stated, "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. at 506, 507, 65 L.Ed. 963 (1921).

The original medical indigency scheme enacted by the legislature envisioned counties providing for the needs of their indigent and medically indigent citizens by the means of poor farms and houses and county hospitals. The counties hired physicians who attended to the medical necessities of these indigent people. The statutory language of those early days required that the county employ a physician for these purposes. Section 2171 Rev.Stat. 1887. As times and conditions changed, the counties discontinued the poor farms and in many instances began to rely upon private hospitals rather than county-operated hospitals. The county physician was replaced by private physicians working through these private hospitals. To meet the changing conditions the 1974 legislature changed the language of Section 2171 Rev.Stat. 1887, which had required the county to employ a county physician, to the present day permissive language of I.C. § 31–3402.[1] The

1. "31–3402. **Employment of physician.**—The

board *may* employ a physician to attend, when

changes from mandatory language of the prior statute to the permissive language of today's statute is at the crux of the respondents' argument that doctors' services are not covered.

Respondents specifically argue that when the legislature removed the counties' mandatory duty to employ a county physician the legislature indicated its intent that doctor bills were not covered by the medical indigency statutes. However, the historical development of medical indigency law in Idaho does not support this conclusion.

In *Idaho Falls Consolidated Hospital v. Bingham County Board of County Comm'rs*, 102 Idaho 838, 642 P.2d 553 (1982), Justice Bistline, in a special concurrence, summarized the historical background of today's statutes. Justice Bistline wrote:

"A considered review of the history of the legislative scheme thus leads to the inescapable conclusion that the legislature in 1974 created the class of 'medically indigent,' and that this classification is wholly independent and separate from the indigent sick, and from the otherwise poor or indigent. What is learned from the review is that it has always been the sense of the people of Idaho, speaking first through their territorial legislatures, then through their Constitutional delegates, and since 1889 through their state legislatures, that medical care and necessities of life will not be denied to those unfortunate few who would suffer and sometimes perish if the same were not provided by the largess of the people acting through their government, which taxes for that very purpose." 102 Idaho at 845, 642 P.2d at 560.

Continuing:

"The statutory scheme now is, and has long been that, other than in cases of emergency, application for relief must first be made to the county. When relief is granted, it is in the form of an order, and the order is simply that the county, playing its part in the promotion of our common welfare, takes some of the money which it has collected through taxation, and purchases for the unfortunate indigent that which he must have and is unable to purchase for himself, i.e., groceries, fuel, *medical and hospital services,* and in the other field I have mentioned, legal services, where he has been named as an accused. It is a clear application of the doctrine of parens patriae, and clearly within the contemplation of our Idaho Constitution as well as most civilized societies." 102 Idaho at 846, 642 P.2d at 561 (emphasis added).

Viewed in their totality, the Idaho indigency statutes are not exclusively hospital reimbursement provisions. They have historically covered all of the needs of indigents, including food, clothing, housing and medical and hospital services. We do not perceive the 1974 amendment to I.C. § 31-3402, changing the mandatory requirement that a county employ a county physician to a permissive requirement, to express a clear legislative intent that the medically indigent be deprived of the emergency services of a doctor. Viewed in their historical perspective, Idaho's medical indigency statutes include the services of physicians. To interpret those statutes so as to cover only hospital services, but not physician services, would, in effect, deprive the medically indigent of any meaningful medical treatment. Hospitals could hardly perform their function and engage in any treatment, particularly the kind of treatment contemplated by the emergency medical statutes, without physicians being involved in every step of that medical treatment. To accept the county's argument would deprive indigents not only of physi-

necessary, the patients of the county hospital, provided, however, that the board of county commissioners may enter into contracts with groups of licensed physicians for medical attendance upon patients of the county hospital or other persons receiving medical attendance at county expense. They may provide for the employment, at some kind of manual labor, of such of the patients as are capable and able to work and the attending physicians must certify to the person in charge or lessee of the county hospital the names of such of the patients as are incapable of manual labor, and when any such patient becomes capable the physician shall certify the fact." (Emphasis added.)

cians' services, but also any meaningful hospital services.

Accordingly, we conclude that the emergency indigent medical care provided for in I.C. § 31–3202, and chapters 34 and 35 of Title 31, Idaho Code, includes reasonable charges for doctor's services, as determined by the factfinder, whether or not the doctor is a paid staff employee of a hospital, or an independent practitioner. Our interpretation is based entirely upon our discernment of the legislature's intentions from reading the foregoing statutes in their historical perspective.

Reversed. Costs to appellant. No attorney fees.

BISTLINE and HUNTLEY, JJ., and McFADDEN and SMITH, JJ. Pro Tem., concur.

BISTLINE, Justice, specially concurring.

My concurrence in the opinion authored by Justice Bakes is premised on the basis that he has made a correct resolution of the narrow issue presented, and also because I am in agreement with his view that although the legislative thought in changing "shall" to "may" in I.C. § 31–3402 is not *entirely* clear, it is clear enough when read with regard to historical perspective. The historical perspective dates from the year 1864 and the second session of the territorial legislature, Sess. Laws, ch. 24, p. 424, which had for its purpose "the care, protection and maintenance of the indigent sick." The counties of the territory, through their boards of commissioners, were delegated the duty of attending to the administering of such aid, and were authorized to raise the requisite financing for such aid by both a property tax and a per capita tax, earmarked for a special fund with expenditures therefrom to be made only on order of the board.

In the 1974 amending of the indigency law, a new chapter 35 was created. Section 31–3501 thereof provides as follows:

**31–3501. Declaration of policy.**—In order to safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state, and, in the case of indigent persons, to provide for the payment thereof, the respective counties of this state shall have the duties and powers as hereinafter provided.

It is not possible to misconstrue that legislative language. As to indigent persons, the legislature's mandate was that their *care* and hospitalization were to be provided and paid for; the counties of the state were accordingly both empowered and obligated as provided in the chapter. Significantly, "hospitalization" was the word utilized to express being hospitalized, and "care" was the word used to express being treated by someone. "Someone," under the laws of the state of Idaho would have to be a licensed surgeon or physician. Chapter 18 of Title 54, "Medical Practice Act."

That hospitals in addition to providing hospitalization may also provide medical or surgical care is envisioned in the set of definitions fashioned by the 1974 legislature. I.C. § 31–3502(2). In that circumstance it is obvious that the use of the phrase "care and hospitalization" as used in § 31–3501 would be redundant as to "care." Where a hospital does *not* furnish surgeons or physicians, it is not superfluous to speak in terms of both hospitalization and care.

The main theme of the argument advanced in the amicus brief of catastrophic illness was the rather specious contention that the word "may," as used in Idaho Code § 31–3402, ought not to be judicially contorted into the word "shall." That worry is unfounded; there is no need to so indulge. The argument seeks to convince us that in the terminology of the statute the county has an option, that option being whether to employ or not to employ a physician or group of physicians. Amicus brief, p. 12.

That, however, is not the option. The option of the statute is otherwise. The option of the county is that of employing (appointing) a county physician, and, if not, the alternative of contracting out, much as in indigent criminal defense work, the

whole shooting match. The balance of I.C. § 31–3402 (not set out in the amicus brief) might have proved helpful to counsel.

> They [the county commissioners] may provide for the employment, at some kind of manual labor, of such of the patients as are capable and able to work and *the attending physicians* must certify to the person in charge or lessee of the county hospital the names of such of the patients as are incapable of manual labor, and when such person becomes capable the *physician* shall certify the fact. I.C. § 31–3402 (emphasis added).

*Entirely* clear in my view is it that the legislature was of a mind that there will always be available to the sick or injured indigent, under one option or the other as provided by I.C. § 31–3402, an attending physician (or surgeon). Of like import, I.C. § 31–3409 requires that there be an attending physician whose judgmental call is required in order for a county patient to be dismissed from a county hospital.

Idaho Code § 31–3402, as modified from time to time, antedates Idaho statehood by seven years. Of greater age is I.C. § 31–3401, which dates back to 1864, and, in language similar to that found in § 31–3402, presently provides that the county commissioners can contract out the care, protection, and maintenance of the medically indigent, sick, or otherwise indigent of the county.

It seems entirely clear that, as Justice Bakes has detailed, there never was a time since 1864 when Idaho, as a territory and then as a state, did not look out for the welfare of its disadvantaged, its impoverished, and its sick.

As long ago as 1935 this Court took note of the Idaho indigency statutes, and having done so wrote that the law imposed upon the county a public duty to care for the indigent sick and poor of the county. It added that taxes may be levied for payment of such imposed obligations. It added also that under the law it could fulfill its duty "directly or by contract," going on to explain that building and operating a hospital was "optional and discretionary" with the county. Another option of a county,

once it had built and was in operation of a county hospital, was as to non-indigent patients to carry insurance to secure it against such [malpractice] risks or to refuse to accept such patients. *Henderson v. Twin Falls County*, 56 Idaho 124, 50 P.2d 597 (1935).

To "care for" was for over 50 years understood as providing the indigent sick with medical/surgical attention, together with hospitalization when necessary. In *Henderson*, a county-funded and county-operated hospital was involved. The public duty to care for the indigent sick was reaffirmed, and continues to this day.

SMITH, J., Pro Tem, concurs.

750 P.2d 954

**FAIRWAY DEVELOPMENT COMPANY, Plaintiff–Appellant,**

v.

**BANNOCK COUNTY, Idaho; Lyle Leslie, Bannock County Assessor; Vivian Crozier, Bannock County Treasurer; Tom Katsilometes, Carolyn Meline and George Shiozawa, Bannock County Commissioners, Defendants–Respondents.**

No. 16734.

Supreme Court of Idaho.

Feb. 23, 1988.

**934**

Peterson, Moss, Olsen, Meacham & Carr, Idaho Falls, for plaintiff-appellant. Stephen D. Hall, argued.

Erich N. Storm, Deputy Pros. Atty., Pocatello, for defendants-respondents.

HUNTLEY, Justice.

Fairway Development Company appeals the trial court's grant of summary judgment to Bannock County, the Bannock County Commissioners, Assessor and Treasurer (hereinafter "Bannock"), after cross-motions for summary judgment were filed by both parties. Fairway had filed a complaint for review of decisions by the Board of Tax Appeals and by the Bannock County Commissioners, sitting as a Board of Equalization, which upheld the Bannock County Assessor's property tax evaluation of plaintiff's real property.

Since 1977, Fairway Development Company has owned and operated a fifty-six unit apartment complex known as "Fairway Estates" in Pocatello, Idaho. In October 1978, Fairway filed a Declaration of Condominium for Fairway Estates and has since attempted to sell the units as condominiums, while continuing to rent the unsold units as apartments. After the declaration, Fairway improved the common areas of Fairway Estates by, among other things, adding a pool and carports. To date, nine of the fifty-six units have been sold as condominiums.

Since the Declaration of Condominium, Bannock County has appraised each unit in Fairway Estates as a condominium, using the market data method (which looks to current open market sales of similar units). As a result, the appraised value increased from approximately $8,749 per unit to between $28,700 and $30,350 per unit; an average increase of 337%. Since 1980, Fairway has paid its property tax on Fairway Estates under protest, contending that Bannock County's assessment unconstitutionally and in violation of I.C. § 63–202[1]

---

