691 P.2d 1190

Clarence CARPENTER and St. Alphonsus Hospital, Plaintiffs-Respondents,

v.

TWIN FALLS COUNTY, Idaho and its Board of County Commissioners, Defendants-Appellants.

No. 14389.

Supreme Court of Idaho.

Nov. 7, 1984.

Rehearing Denied Dec. 28, 1984.

Lloyd J. Webb, Twin Falls, for defendants-appellants.

Phillip S. Oberrecht and Glenna M. Christensen (argued), of Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, for plaintiffs-respondents.

BISTLINE, Justice.

Elva Carpenter was hospitalized at St. Alphonsus Hospital in Boise with a terminal illness on April 21, 1980. Upon her death on May 4, 1980, a total hospital bill of $10,614.09 was rendered by the hospital to her surviving husband, Clarence Carpenter. While Mrs. Carpenter was in the hospital, Mr. Carpenter, using a county-printed form which he obtained from a county secretary, partially completed an "Application for County Assistance." Carpenter would later testify that on or about May 8, 1980, he personally delivered the application, which was neither signed nor sworn to, to Merle Leonard, then Chairman of the Board of County Commissioners; that he had not signed it because he knew his signature had to be "notarized" by someone; that Mr. Leonard stated that the application was "all right." Tr., pp. 10, 12. Mr. Leonard would later testify that he did not recall ever suggesting to Mr. Carpenter that the application was all right even though it was not signed, but that he just took the application. Tr., p. 32.

By letter of May 27, 1980, the Commissioners advised Mr. Carpenter that the application was incomplete and did not meet the requirements of I.C. § 31–3404. The letter suggested that additional data be supplied concerning the treatment involved and the dates and costs thereof. The letter concluded with the statement "we can do nothing but consider that no formal written application ... has been filed." The letter, which was addressed to Elva Carpenter at the residence specified in the application—519 Wiseman Street, Hansen, Idaho—was returned undelivered. A second letter sent to Clarence and Elva Carpenter, Route 1, Kimberly, Idaho, was also returned undelivered. This letter was from attorney Lloyd J. Webb, informing the Carpenters that the County Commissioners had directed him to inform them that the incomplete application was rejected. A second paragraph added: "Under the law, you have a right to hearing before the Board of County Commissioners to review this denial. If you wish a hearing, please advise either me or the County Commissioners in writing within the next 20 days so that we can schedule the appropriate procedures." A third letter of rejection was sent to Carpenter at Route No. 12, Box 199, Gooding, Idaho, and that letter was ultimately delivered.

Prior to the delivery of the third letter, the Commissioners received a certified letter from counsel for the Hospital, dated August 19, 1980, requesting a redetermination hearing.[1] Enclosed with the letter was an itemized statement for the services that had been rendered. A hearing was duly scheduled for November 21, 1980.

At the hearing and prior to the taking of any testimony, three exhibits were stipulated into evidence; these included the application, the hospital records of services and charges, and a bankruptcy court notice which declared that Mr. Carpenter had filed a petition for bankruptcy on July 21, 1980. There ensued a colloquy between counsel for the Hospital and independent counsel representing the Commissioners.

---

1. I.C. § 31–3505 provides in part that "[i]f the application is denied, the applicant may request a hearing before the board of county commissioners. The applicant shall be entitled to judicial review of the decision of the board, in substantially the manner provided in the administrative procedures act, chapter 52, title 67, Idaho Code."

When asked why the Commissioners initially denied the Carpenter application, counsel for the County responded: "I suppose the answer, counsel, to your question has to be because we simply felt we lacked information upon which to act. ... [T]he denial was merely to avoid getting caught in a trap of letting the application sit without action ...." Tr., p. 7. (I.C. § 31–3505 provides that "[i]f the board of county commissioners fails to act upon an application within sixty (60) days from the receipt of said application, it shall notify the applicant in writing, or upon its failure to give notice within said time, the application shall be deemed approved ....")

The first letter from the Commissioners suggests that the information to which counsel appears to have been referring was data concerning the treatment received by Mrs. Carpenter, the dates and cost thereof.[2] The county's application form, however, provided no place for the insertion of such information. The form utilized is captioned APPLICATION FOR COUNTY MEDICAL INDIGENT ASSISTANCE. Paragraph 2 of the form is structured so that the form can be used in emergency and non-emergency situations. Basically it is a statement that the applicant is without assets or without average monthly income from which he or she could reasonably be expected to pay necessary hospitalization costs. Paragraph 5 provides a financial statement to be filled out. Mr. Carpenter did so, including therein with his statement of Total Monthly Expenses that his wife "is presently in intensive care in Boise, had extensive surgery—with several Drs. Also estimate 3 weeks yet in intensive care—will be considerable skin grafts done." This information, although not requested by the county's form, appears to be in compliance with all of the various provisions of I.C. § 31–3504.[3]

As is discussed *infra*, an application for certification of medical indigency status is made to the clerk of the Board of County Commissioners, and not in the first instance to the Board. The clerk has the further duty to investigate the claim of indigency, or cause it to be investigated, and thereafter report his findings to the Board—who will then approve or deny the application. Where the application precedes medical or hospital treatment, initially the only question before the clerk, and in the Board, is determination of the asserted status. In emergency situations the person claiming or on whose behalf claim of medical indigency is made is obligated to make application for the status determination only—leaving for later, presumably at the termination of services, the validity of the monetary claim which will be submitted to the Commissioners for their action.

The legislature has required a timely application for certification as to medical indigency status, but has not required the same alacrity regarding the submission of claims. For instance, I.C. § 31–3509 provides that "Hospitals making claims for the hospitalization of medically indigent persons shall make all reasonable efforts to determine liability for the account so incurred from any available insurance or other sources ... prior to submitting the bill to the county for payment." I.C. § 31–3508 refers to a bill "submitted for payment pursuant to section 31–3405, Idaho Code," but I.C. § 31–3405 merely provides

---

**2.** It was stipulated at the hearing of November 21, 1980, that Exhibit 3 was a true copy of the records of St. Alphonsus Hospital, and that the charges represented by the exhibit were the customary charges of the Hospital for the particular treatment rendered, that the services rendered were emergency treatment and the Hospital's charges were the regular charges for bona fide emergency treatment.

**3.** Section 31–3504 reads:
"An application for or on behalf of a medically indigent person receiving emergency medical services may be made any time within forty-five (45) days following the admission of said person to the hospital furnishing said care. If a person becomes medically indigent subsequent to admission to a hospital or subsequent to receiving treatment by a hospital, an application for the person, or on his behalf, shall be made within thirty (30) days of the time the person becomes medically indigent. The chargeable county or counties shall be notified as soon as practicable upon the hospital's obtaining information disclosing that a patient is medically indigent."

that "the bill for such hospitalization or expenditure shall be presented to the board of county commissioners, duly verified under oath," without specifying who has the obligation to present the bill or at what time.

■ The statutory scheme as written and scattered haphazardly in the various sections is confusing. At least one thing is clear however, and that is that there is no requirement that the indigent applicant include the hospital bill with his application. This makes sense; if the application is for non-emergency assistance, there will be no bill at the time the application is filed, and the same situation will also occur in some cases in which the application is for emergency medical benefits because of the time restrictions on the filing of an application. Under the circumstances, it appears that it would be clearly inappropriate for county commissioners to deny an application for medical indigency assistance on the sole ground that information regarding the medical bill had not been submitted, without ever notifying an indigent applicant that he or she was expected to provide such information.

We hold that the application clearly complied with the requirements of I.C. § 31–3504. As the lower court pointed out, I.C. § 31–3404 excepts from its provisions medical indigency petitions filed under I.C. § 31–3504, which specifically deals with the medically indigent receiving emergency services. We agree. Hence, there was no requirement of Mr. Carpenter that he subscribe and swear to a petition, which he submitted on behalf of his hospitalized wife.

At the hearing on November 21, 1980, Carpenter testified that at the time the debt in question was incurred and at the time the application for assistance was filed, he was employed by a farmer who paid him $750 a month plus housing. Carpenter further testified that he quit this job because his daughter did not want him living alone and his son-in-law needed help on his farm. At the time of the hearing Carpenter was living with his daughter's family and working for his son-in-law for his room and board plus some occasional spending money. Carpenter testified that it was "possible" that employment as a farm laborer would be available to him if he wanted to return to that sort of work. He also testified at the hearing that he had virtually no assets and a total outstanding indebtedness of $25,797.71, including the bill from the hospital for $10,614.09. At the hearing the Commissioners were made aware of the fact that on or about July 22, 1980, Carpenter had filed a voluntary petition in bankruptcy and that the hospital's claim was among those inventoried in the bankruptcy petition.

Upon completion of the hearing, the matter was taken under advisement by the Commissioners. On January 9, 1981, the Commissioners reaffirmed their earlier rejection of the Carpenter claim on the basis of: (1) The lack of filing of a properly executed claim; (2) The lack of notice of emergency medical indigent treatment as required by I.C. § 31–3504; [4] (3) The lack of medical indigency; (4) The applicant's lack of any recognizable claim for assistance, since he had filed in bankruptcy and inventoried the hospital's claim; and (5) The unavailability of county medical indigency benefits to a bankruptcy trustee. The respondents appealed from the Commissioners' decision to the district court.[5]

The district court, after a hearing and upon the record and transcript of the hearing of November 21, 1980, reversed the

---

**4.** In cases in which emergency medical services have been provided, I.C. § 31–3504 states that "[t]he chargeable county or counties shall be notified as soon as practicable upon the hospital's obtaining information disclosing that a patient is medically indigent."

**5.** The record on appeal does not include a copy of the Commissioners' findings. The parties have not asked to have the record augmented, apparently believing that the grounds for the decision are sufficiently set forth in the record. We agree that an augmentation of the record is not necessary, the district court's memorandum opinion being sufficient to apprise this Court of the grounds for the Commissioners' decision.

decision of the Commissioners. The court found that Carpenter was medically indigent, that the application filed by him was sufficient to initiate the claim procedure, that no prejudice was shown by the Hospital's alleged failure to notify the County that emergency medical services had been provided to the Carpenters, and that the hospital, as a real party in interest, could pursue the claim for medical indigency assistance. Accordingly, the court directed the Commissioners to pay the claim to the Hospital. This appeal is taken from the district court's decision.

I.

I.C. § 31-3404 requires that an application for medical indigency benefits "must be signed by the party or parties making such application and sworn to before some officer authorized by the laws of this state to administer oaths . . . ." In this case the application was not signed or notarized.

Relying upon *University of Utah Medical Center v. Bonneville County*, 96 Idaho 432, 529 P.2d 1304 (1974), the County argues that the district court erred in requiring the Commissioners to honor Carpenter's application, no proper application having ever been submitted. The holding in that case was somewhat different than the cast in which the County sees it. A facial review of that case shows that it was the attorney for Bonneville County who responded to the Hospital's claim for payment from the clerk of the Board of County Commissioners. The attorney's response was on behalf of the commissioners, and not the clerk. This Court's opinion noted that "The appellant has never received a denial of eligibility from the clerk . . ." and "never properly pursued the administrative requirements of I.C. § 31-3404 to obtain a certificate of need . . . ," notwithstanding that the only means for appel-

lant to obtain reimbursement is to obtain the certificate of need and establish to the county commissioners (1) that it was an emergency situation, and (2) that the medical services were incurred.

"The County Commissioners may not consider payment of the claim until the certificate of need is obtained and therefore the trial court correctly held that the County was not presently liable for the medical expenses. The appellant must obtain certificates of need before presenting its claim to the County Commissioners."

96 Idaho at 435, 529 P.2d 1304.

In essence, what the Court there held was that the Hospital, the appellant in that case also, had failed to note that what was required was an application to the clerk for certification of indigency—not a letter requesting payment. Upon obtaining the certificate the Court held that a claim could be submitted for medical expenses together with proof of an emergency situation under the provisions of then I.C. § 31-3407.[6]

The Court's holding in *University of Utah Medical Center v. Bonneville County* was predicated upon the failure of the Hospital to obtain a certificate of indigency before pursuing a monetary claim against the Commissioners. The statutory procedure was thereafter amended so as to relieve the clerk from the obligation of passing upon the application for indigent status. Under the provisions of I.C. §§ 31-3404 and -3405, as amended in 1976, written application for aid is still made to the clerk. (These sections specifically require the application to be made and filed in the clerk's office at least ten days prior to admission to any hospital or health care center, and do not purport to govern emergency situations, which are covered in I.C. § 31-3407.)

6. Section 31-3407 as it read when applicable to that case is as follows:

"Provided further that a claim against the county shall be allowed for services rendered prior to obtaining the certificate heretofore mentioned where a licensed hospital renders the services to an indigent sick person in an

emergency and subsequently there is obtained said certificate heretofore mentioned. Services rendered in an emergency are defined as those reasonably necessary to alleviate illness or injury which if untreated is apt to maim or cause death."

Under §§ 34–3404 and –3405 the clerk is given the duty to investigate or cause to be investigated the grounds of an application, and thereafter file with the Board of Commissioners a statement of his other findings. Where the Commissioners will not be meeting in regular session within the next ten days, the clerk has limited authority, not exceeding an expenditure of $200, to approve hospitalization or immediate necessities. I.C. § 31–3406 places upon the commissioners the obligation of judging from the application and the clerk's statement of findings whether the applicant is medically indigent and whether relief sought shall be provided for, or, where hospitalization has already taken place, to pay for it. This latter provision squarely encompasses emergency situations, which are not covered in §§ 31–3404 and –3405, but are dealt with in I.C. § 31–3407.

I.C. § 31–3407 rather confusingly in the first sentence deals with allowances to indigents and allows the commissioners, or any one of them individually, to order allowances limited to $200, and, in the same sentence, deals with emergency situations where a hospital renders service prior to approval of an application for county aid. It is the last disjunctive clause of the first sentence that authorizes the county to pay claims where the services have been rendered in an emergency situation and claim for reimbursement is sought afterwards. The portion of § 31–3407 which is here applicable, and which the legislature more appropriately should have addressed in a separate section, reads as follows:

> "[P]rovided further that a claim against the county shall be allowed for services rendered prior to approval of the application heretofore mentioned where a hospital renders the services to a medically indigent person in an emergency and *subsequently there is obtained said approval* heretofore mentioned. Services rendered in an emergency are defined as those reasonably necessary to alleviate illness or injury which if untreated is likely to cause death or serious disability." (Emphasis added.)

The balance of § 31–3407 deals with the fixing of the liability on the correct county, and verification of the bills.

■ The County argues that I.C. § 31–3407 requires county commissioners to disallow any claim or demand against a county for medical aid absent filing and approval of a properly executed written application. We do not agree. Like the district court, we hold that the application submitted by Carpenter although not signed or notarized, was sufficient to *initiate* the claim procedure.

The County's citing of *University of Utah v. Bonneville County,* 96 Idaho 432, 529 P.2d 1304 (1974), for its proposition is improper. That case is inapposite. In *University of Utah,* the Court held that the county commissioners could not consider payment of a claim for medical indigency benefits until a certificate of need had been obtained and that therefore the trial court had correctly held that the County was not presently liable for the medical expense at issue. However, I.C. § 31–3407, as it existed at that time, expressly dictated such a result, providing in part:

> "CERTIFIED CLAIMS ONLY TO BE ALLOWED.—The county commissioners must not allow any claim or demand against the county for services rendered to any sick or indigent person who has not previously obtained from the probate judge, clerk of the board of county commissioners, or justice of the peace [a certificate of need] and must not allow any claim or demands whatsoever against the county for any expense incurred by, or in behalf of, any sick or indigent person before the filing of the application and certificate aforesaid …."

1957 Idaho Sess. Laws, ch. 168, § 1, p. 303.

The filing of the certificate and certification of need were express conditions precedent to the allowance of any claim under I.C. § 31–3407 as its language read at that time. Therefore, the result in *University of Utah v. Bonneville* was mandated by

the plain wording of the statute. This is not true in this case.

■ In 1976, the requirement of a certificate of need was eliminated, and I.C. § 31–3407 was amended to provide simply that:

"The county commissioners shall not allow any claim or demand against the county for services rendered to any medically indigent, sick, or otherwise indigent person until the filing and approval of the application .... "

Thus, I.C. § 31–3407 merely requires the filing of an application and its approval by the county commissioners prior to the allowance of a claim for medical indigency benefits. Nothing in the statute mandates that a claim be denied if the technical requirements of I.C. § 31–3404 are not met, nor do we believe that it would be proper for this Court to impose such a requirement. *See Mary Day Nursery Children's Hospital v. City of Akron*, 189 N.E.2d 745 (Ohio Ct. Common Pleas 1961) (where there is a requirement for notice in a statute, but no special penalty for the failure of a person or hospital to provide such notice, lack of notice will not necessarily defeat the claim).

■ It is the duty of courts in construing statutes to ascertain the legislative intent and to give effect thereto. *Summers v. Dooley*, 94 Idaho 87, 481 P.2d 318 (1971). The legislature's general intent in enacting the medical indigency assistance statutes was two-fold: to provide indigents with access to medical care and to allow hospitals to obtain compensation for services rendered to indigents. I.C. § 31–3501 ("DECLARATION OF POLICY.—In order to safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of indigent persons in this state, and to

provide for the payment thereof, the respective counties of this state shall have the duties and powers as hereinafter provided."); *Braun v. Ada County*, 102 Idaho 901, 903–04, 643 P.2d 1071, 1073–74 (1982).

Given the two-fold purpose of the statues here in question, it would be clearly inappropriate to hold that a claim against the responsible county for medical indigency benefits can be denied simply because the application submitted does not comply with the technical requirements of I.C. § 31–3404. The specific purpose of I.C. § 31–3404 is undoubtedly to provide the county commissioners with sufficient accurate information upon which to base their decision regarding a claim for medical indigency benefits. In this case, such information was provided at the hearing before the Commissioners on November 21, 1980, when Carpenter testified under oath regarding his application for benefits and the circumstances surrounding it, thereby curing defects in the original application. Accordingly, we hold that the application filed by Carpenter in this case was sufficient to *initiate* the claim procedure and that the Commissioners thereafter erred in denying him benefits on the ground that he initially failed to comply with the technical requirements of I.C. § 31–3404.[7]

## II.

■ The County also argues that the district court erred in requiring the Commissioners to honor the Carpenter application because the County was not given timely notice of the emergency medical services provided as is required under I.C. § 31–3504: "The chargeable county or counties shall be notified as soon as practicable upon the hospital's obtaining information disclosing that a patient is medically indigent." Again, however, nothing in the

7. Appellants have also contended that no timely application was made, citing I.C. § 31–3504, which requires an application for emergency medical services to be made within forty-five days following admission to the hospital of the person receiving such services. They contend that no proper application was possibly made prior to the hearing before the Commissioners, and such being the case, that the application was untimely. However, our holding that the application filed by Carpenter was sufficient to initiate the claim procedure disposes of the appellants' contention that the application was untimely. Mr. Carpenter filed his application on approximately May 8, 1980, well within the forty-five day deadline.

statutes provides that the claim may be denied if such notice has not been provided by a hospital. Applying the rationale set forth in part I, *supra*, we hold that the failure to provide the notice contemplated by I.C. § 31–3504, does not necessarily defeat a claim for benefits. *See Mary Day Nursery, supra.* Furthermore, we agree with the district court that the failure to provide notice could not serve as a ground for denying benefits in this case where the County was not prejudiced by the lack of notice.

Mrs. Carpenter was admitted to the hospital on April 22, 1980, and she died on May 4, 1980, while receiving treatment for the emergency condition for which she had been hospitalized. Although it does not appear that the Hospital notified the County that it was rendering or had rendered emergency medical services to Mrs. Carpenter, the Carpenter application for benefits was submitted to the County on approximately May 8, 1980, and the County was thereby put on notice that medical services had been rendered to one claiming to be indigent. Although the County argues that "[t]he County is entitled to statutory notice so that appropriate action may be taken, including the possibility of the transfer of the patient to a hospital where the County has an agreement for the treatment of medically indigent persons," the record demonstrates the non-feasibility of such a transfer in that she was transferred to St. Alphonsus Hospital from Magic Valley Memorial Hospital in Twin Falls.

In the absence of any showing of prejudice or unnecessary expense caused by the lack of notice, we are not persuaded that the district court erred in ruling that the Commissioners erroneously denied the Carpenter application on the ground that the County had not been given notice of the emergency medical services as required under I.C. § 31–3504.

### III.

The County also argues that the district court erred in holding that there was no basis in fact for the decision of the Commissioners that Carpenter was not "medically indigent," as defined by I.C. § 31–3502. The County contends both that the district court exceeded its statutory authority in reversing the factual determination of the Commissioners, and that Carpenter, in fact, was not medically indigent.

### A.

I.C. § 31–3505 provides in part that "[t]he applicant shall be entitled to judicial review of the decision of the board, in substantially the manner provided in the administrative procedures act, chapter 52, title 67, Idaho Code." I.C. § 67–5215(g) provides:

> "The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> . . . .
>
> (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) arbitrary or capricious or characterized by abuse of discretion of clearly unwarranted exercise of discretion."

Although the district court's ruling was not couched in this statutory language, it is clear from the language it used, "there was no basis in fact," that it believed the Commissioners' decision to be either clearly erroneous or arbitrary or capricious.

### B.

So understanding, our obligation, then, is to ascertain if the district court was in error. Medical indigency has been specifically defined by the legislature in I.C. § 31–3502(1):

> "'Medically indigent' means any person who is in need of hospitalization and who, if an adult, together with his or her spouse, ... does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services."

This definition is in sharp contrast to that of the term "indigent," which the legislature has defined as "any person who is destitute of property and unable to provide for the necessities of life." I.C. § 31-3502(7). Thus, it is clear that the legislature did not intend that a person be completely destitute or devoid of all resources in order to be considered medically indigent, but only that the person be unable to pay for necessary medical services. *See McMullen v. Hargis*, 128 Ariz. 142, 624 P.2d 339 (1980) (holding that under the applicable statutory provisions a person need not be impoverished or devoid of all assets to qualify as an indigent sick person, but only that the person be unable to pay for necessary medical care); *County Department of Public Welfare v. Trustees of Indiana University*, 145 Ind.App. 392, 251 N.E.2d 456 (1969) (statutes defining medical indigency do not require a complete lack of resources in order to be eligible for assistance, but only that a person not have resources sufficient to pay for all medical and hospital services required); *State ex rel. Hendrickson v. Gallatin County*, 165 Mont. 135, 526 P.2d 354 (1974) (even though the petitioners might not have been considered economically indigent insofar as general assistance was concerned, they were entitled to medical indigency assistance because they had no means to meet the medical catastrophe which had descended upon them).

The reasoning of the Montana Supreme Court is persuasive:

"The intent of the county medical assistance program, section 71-308, is to extend broad coverage to those who, due to calamitous circumstances, are faced with medical costs they cannot hope to meet. In *St. Patrick v. Powell County*, (1970), 156 Mont. 153, 159, 477 P.2d 340, this Court articulated the liberal parame-

ters of coverage entailed by section 71-308:

"'* * * we do not understand the legislative intent to be that in order for a person to be an "indigent person" within the meaning [of the general welfare statutes] to receive medical assistance there must be a total lack of resources. Rather, we believe the legislative intent was to include those persons who do not have the present or further hope of resources sufficient to pay for all the medical and hospital services required in emergency instances.' 156 Mont. 159, 160, 477 P.2d 343. (Bracketed material added.)"

*Wheatland County v. Bleeker*, 175 Mont. 478, 575 P.2d 48, 50 (1978).

A review of the record *clearly* demonstrates that Mr. Carpenter did not have income and resources available which would enable him to pay for the emergency medical services provided for his wife.

The application and testimony of Mr. Carpenter disclose that at the time the application was prepared, Mr. Carpenter was employed as a farm laborer and received $750 per month, plus his housing. In addition, Mrs. Carpenter received $193 per month in Social Security disability income. Thus, the Carpenters had a total monthly income of $943 prior to Mrs. Carpenter's death.[8] The couple's monthly expenses included $200 for food, $100 for fuel, $50 for clothing, $20 for insurance, $65 for utilities, and $65 for transportation. Thus, prior to the payment of any outstanding debts, the couple's ordinary monthly living expenses totaled $500. In addition, it appears that the Carpenters were paying approximately $193 per month to the bank on their car loan, $45 per month to Spiegel, $78 per month to Wards, and $23 per month to Lane Bryant, for a total of $339 in additional monthly expenses. The Hospital's bill was for a total of $10,614.09. When added

---

**8.** Appellants have suggested that when the fact that the Carpenters' housing was provided is considered, "a reasonable estimate of monthly income for the Carpenters would be approximately $1200." Appellants' Brief, p. 26. However, an applicant's eligibility for assistance must be based upon an applicant's "available, spendable income or resources." *Bleeker*, 575 P.2d at 51. "Certainly [housing] cannot be converted into the cash necessary to pay medical bills for, as assets, they are without the characteristic attributes of liquidity." *Id.*

together with the Carpenters' previous debts and the amounts owed to approximately fourteen other entities for services rendered in connection with Mrs. Carpenter's last illness, Mr. Carpenter's total indebtedness amounted to $25,797.71. The only assets which Mr. Carpenter possessed were $1,000 worth of furniture and appliances and a 1978 Ford LTD automobile on which $4,000 was owing. After Mrs. Carpenter's death Mr. Carpenter voluntarily quit his job. At the time of the November 21, 1980, hearing before the Commissioners he was working for his son-in-law for his room and board.

The respondents have argued that Mr. Carpenter clearly was medically indigent because at the time of the hearing before the Commissioners he had virtually no income. We believe that the Commissioners were not bound by that single fact, and that they were free to consider all the facts, including that Mr. Carpenter was a healthy individual who had voluntarily quit his job. *See Albany Medical Center Hospital v. Harris,* 28 A.D.2d 784, 280 N.Y. S.2d 778, 779–80 (1967) (medical indigency should be decided not only in light of the facts upon admission, but also in light of facts after the patient's death, including that the spouse was the beneficiary of a life insurance policy, that there were debts and expenses other than the hospital bill, including funeral expense, and that the spouse was unemployed). Even if we assume that Carpenter was capable of earning the income he was receiving at the time his application was filed,[9] however, the facts set forth above demonstrate that Mr. Carpenter would not "have income and other resources available to him from whatever sources which [would be] sufficient to enable [him] to pay for the necessary medi-

cal services." I.C. § 31–3502(1). Accordingly, we hold that the district court did not err in finding there was no basis in fact for the Commissioners' decision to deny Carpenter's application for benefits on the basis that he was not a medically indigent person.

## IV.

The appellants finally contend that the district court erred in requiring the Commissioners to honor the Carpenter application because Mr. Carpenter, having filed a petition in bankruptcy, "has no standing to obtain County medical indigent benefits," Appellants' Brief, p. 29, and because "[t]he hospital does not enjoy the standing of the indigent. Its claim is purely derivative, through the indigent, and if his claim fails, then the hospital's claim fails." Appellants' Reply Brief, p. 10. We disagree.

I.C. § 31–3406 provides that "[t]he county commissioners of [a] county shall, after the filing of the application [for medical indigency benefits] ..., if in their judgment the applicant is medically indigent make such provisions for his relief or pay for his hospitalization, as may be necessary under the circumstances." This provision demonstrates the legislature's intent that the responsible county pay for hospitalization upon a finding that an applicant is medically indigent. I.C. § 31–3407 provides that payment for hospitalization of medically indigent persons shall be controlled by Chapter 35, Title 31, Idaho Code. I.C. § 31–3508 puts an end to the matter by providing:

"The county responsible for payment of hospitalization of a medically indigent person shall pay an amount not to exceed the reimbursement rates *to the hospital*

---

9. Although the $193 in Social Security disability income ceased upon Mrs. Carpenter's death, there was also a reduction in Mr. Carpenter's monthly living expenses. Rather than speculate as to the net loss, we have simply assumed for the purposes of this opinion that Mr. Carpenter's income and his monthly living expenses would be equivalent to their values before Mrs. Carpenter's death.

Appellants acknowledge that "upon the death of Mrs. Carpenter, Mr. Carpenter would no longer receive the $193 a month for Social Security disability but neither would he have the burden of providing for Mrs. Carpenter." Appellants' Brief, p. 27. They then assert that "[h]is situation would remain virtually unchanged." *Id.*

rendering such services." (Emphasis added.)

We read these provisions as clearly establishing and we so hold, that the Hospital is a real party in interest, entitled to make an application for medical indigency benefits on behalf of the person to whom emergency medical services were provided, entitled to pursue the denial of such benefits by appeal, and entitled to the receipt of the County's payment. *See Montana Deaconess Hospital v. Lewis & Clark County*, 149 Mont. 206, 425 P.2d 316 (1967). Furthermore, in view of the fact that the Hospital possessed a right to pursue the claim for medical indigency benefits independent of that of Mr. Carpenter, it was not prejudiced by the fact that its claim was inventoried on Carpenter's petition in bankruptcy. Although the Hospital was entitled to look to Mr. Carpenter for payment, it also had the right under our Idaho statutes to collect from the responsible county. It is precisely because patients in cases such as this cannot reasonably be expected to pay the amount incurred for hospitalization, that the legislature recognized medical indigency and gave hospitals such a right.

The judgment of the district court is *affirmed.* Costs to respondents. No attorney's fees.

DONALDSON, C.J., and HUNTLEY, J., concur.

BAKES, J., dissents without opinion.

SHEPARD, Justice, dissenting.

I see the result obtained by the majority as an anomoly. As stated by Bistline, J., in *Idaho Falls Consol. Hosp. v. Bingham Cty. Bd.*, 102 Idaho 838, 642 P.2d 553 (1982):

"The remaining changes made clear the intent of the legislature to provide assistance for the 'medically indigent,' that is to say, for *those who are made indigent by catastrophic medical bills*, whether from illness or from injury, or other cause, such as premature birth. *See University of Utah Hospital and Medical Center v. Bethke*, 101 Idaho 245, 611 P.2d 1030 (1980)." (Emphasis supplied.)

Here the patient to whom the services were rendered is no longer indebted to the hospital, his debt having been discharged in bankruptcy. To suggest that one is medically indigent because of a hospital bill which he no longer owes makes no sense whatsoever. Although I recognize the hardship presented to the hospital as a result of having the party responsible for the bill declare bankruptcy, such harsh result is no different from that faced by every creditor in a bankruptcy proceeding.

I would further note the commission's finding, which was based on substantial, competent evidence, to the effect that the plaintiff Carpenter was, at the time the hospital bill was incurred, capable of making payments to the hospital, and that Carpenter had made a personal choice to quit his gainful employment. Factual determinations of administrative agencies should be overturned by this Court only upon a showing of a clearly erroneous decision or of an abuse of discretion. I.C. § 67–5215(g)(6); *Mason v. State, Dept. of Law Enforcement*, 103 Idaho 748, 653 P.2d 803 (Idaho App.1982); *Wagers v. Nichol*, 94 Idaho 6, 479 P.2d 775 (1970). Therefore, I question whether Mr. Carpenter has shown indigency, even aside from the question of his bankruptcy.

I respectfully dissent.