703 P.2d 1342

Olive Kay POWERS, Mildred Anderson and Mary Gentry, on behalf of themselves and all those similarly situated, Plaintiffs-Appellants, Cross Respondents,

v.

CANYON COUNTY and Carlos E. Bledsoe, Delwin Hobza and Glenn Koch, in their official capacities as County Commissioners of Canyon County, Defendants-Respondents, Cross Appellants.

No. 14951.

Supreme Court of Idaho.

July 12, 1985.

John Prusia and Andrew C. Thomas, of Idaho Legal Aid Services, Inc., Caldwell, for plaintiffs-appellants, cross respondents.

Richard L. Harris, Canyon County Pros. Atty., Charles L. Saari and William A. Morrow, Deputy Pros. Attys., Caldwell, for defendants-respondents, cross appellants.

Jim Jones, Atty. Gen., Boise, attorney for amicus curiae.

## ON DENIAL OF PETITION FOR REHEARING

The previous opinion, 1985 Opinion No. 4, issued on January 11, 1985, is hereby withdrawn and this opinion is substituted therefor.

BAKES, Justice.

We are asked to decide whether the eligibility standards for county aid to the medically and otherwise indigent, as contained in I.C. § 31–3502 and adopted by ordinance in Canyon County, are sufficiently definite to withstand a constitutional challenge of vagueness. Also at issue is whether procedural due process requires the county to publicize the availability of the program. We hold that the standards set by the legislature and reflected in the county ordinance are adequate, and that no duty exists to publicize the availability of the program.

The plaintiffs claim to be a class consisting of all applicants for indigent benefits from Canyon County who have been or will be denied benefits. The class is represented by three persons who were initially denied benefits without being afforded the right to make written applications or without being given written denials of benefits from the county. Plaintiffs filed the complaint in the present case alleging that chapters 34 and 35, Title 31, Idaho Code, are unconstitutionally being applied to them because of defects in procedural due process. Subsequent to the filing of this case, each of the three representatives was given a written application, a hearing before the Board of County Commissioners, and an opportunity to appeal the denials to the district court.

Just prior to summary judgment being entered, the parties stipulated and agreed that no material issues of fact remained and stipulated that the following orders could be entered as part of the final judgment of the court:

"That the declaratory relief to which the plaintiffs and all other members of the class are entitled is:

"(a.) Upon initial contact with the County Welfare Office they receive a form upon which to make written application for assistance under the county welfare law and the right to complete a written application on the initial or any subsequent request for such assistance.

"(b.) Prompt written notice of the decision as to eligibility made after investigation, setting forth the reasons for the decision and of the right to an evidentiary hearing before the Canyon County Commissioners prior to final denial of the application in whole or in part.

"(c.) Reasonable time to prepare for the evidentiary hearing and within which to subpoena witnesses.

"(d.) Written notice of the final decision, with findings of fact and with notice of the right to judicial review appeal and the procedures and the time within which the appeal may be perfected."

On December 23, 1982, the district court entered summary judgment by certifying as a class the plaintiffs named and represented; granting the relief to plaintiffs as stipulated by the parties; ruling that the standards for eligibility contained in the county ordinance and chapters 34 and 35, Title 31, Idaho Code, are adequate written

standards; ruling that the county has no duty to publicize the availability of the indigent benefits; and denying plaintiffs an award of attorney fees. Plaintiffs have appealed the rulings on eligibility standards, publication of availability of benefits, and attorney fees. The county has cross appealed the question of certification of plaintiffs as a class.

Plaintiffs argue that chapters 34 and 35, Title 31, Idaho Code, as applied by Canyon County, violate the due process clause of the fourteenth amendment of the United States Constitution because: (1) without the publication of availability of the indigent aid, those eligible are helpless to protect their rights if they are not even aware that aid is available; and (2) the absence of comprehensive written standards for eligibility, based on objective criteria, encourages arbitrary and erratic decisions as to eligibility by Canyon County.

In order to evaluate the procedural due process claim of the appellant, a review of the statutory authority and procedures relating to the county indigency aid program is necessary. Idaho counties are charged with the duty to "care for and maintain the medically and otherwise indigent" within the "limitations and restrictions as are prescribed by law." I.C. § 31–3503. *See generally* Chapters 34–35, Title 31, Idaho Code. Persons desiring aid from a county must be given a written application to be completed. I.C. § 31–3404. The application must set forth and describe all the financial resources of the applicant and be signed under oath. *Id.* If for any reason the indigent person is unable to or fails to complete the application, it may be completed by any third party under oath. I.C. § 31–3408. It then becomes the duty of the clerk of the Board of County Commissioners to "immediately investigate" and file a statement of findings with the board. I.C. § 31–3405. If the board is not to meet within ten days, the clerk, or in other cases an individual commissioner, may authorize up to $200 for the hospitalization or immediate necessities of the person. *Id.*; I.C. § 31–3407. The board must then consider the application with the findings and apply the statutory eligibility standard to determine if the person is "indigent" and entitled to benefits. I.C. § 31–3406. If the applicant is not notified of approval or denial in writing within sixty days of the date of application, then the application is deemed approved. I.C. § 31–3505. If the application is denied, the applicant may request a hearing before the board and judicial review of the board's decision as provided in the Administrative Procedures Act, chapter 52, Title 67, Idaho Code. I.C. § 31–3505. In addition to these procedures required by statute, the parties stipulated that the following procedural relief be granted by the district court requiring the county to: give the written application to the requesting person on the initial contact; give prompt written notice containing reasons for the decision and the right to a hearing; give reasonable time to prepare for the hearing; give final written notice containing findings of fact along with notification of the right to and procedures for judicial review.

I.

*Publication of availability*

Appellants assert that procedural due process requires, in addition to those matters stipulated by the parties, that the county publicize the availability of benefits. Procedural due process is not a stringent set of uniform requirements. It basically requires that a person, whose protected rights are being adjudicated, is afforded an opportunity to be heard in a timely manner. *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). In the case of county aid to the indigent, we find no violation of procedural due process in the county's failure to publicize the program. It does not seem unreasonable or unfair to charge the residents of the county with the constructive notice of the statutes and ordinances which make aid available. Governments have been providing aid to the poor for centuries. *See Idaho Falls Consolidated Hospitals, Inc. v. Bingham County*, 102 Idaho 838, 842, 642 P.2d 553,

557 (1982) (Bistline, J., specially concurring) (history of Idaho counties' aid dating back to 1864); *Hopson v. Schilling,* 418 F.Supp. 1223 (N.D.Ind.1976) (discussion on history of welfare statutes). It is common knowledge that all the local, state and federal governments administer programs to aid the indigent and poor. Certainly it is encouraged and hoped that all persons, whether county agents, officers, religious volunteers, charitable volunteers, social workers, etc., will inform those persons potentially eligible of the availability of benefits so that the basic necessities of life can be satisfied by available programs.

We are not persuaded, however, that procedural due process places a general duty on government to attempt to educate or inform the public of potential penalties or benefits resulting from duly enacted statutes and ordinances properly codified and made available to those seeking actual knowledge of the law. Our entire legal system is based upon the principle that persons are charged with constructive knowledge of the statutes and laws. *E.g., Cooper v. Arizona Western College Dist. Governing Bd.,* 125 Ariz. 463, 610 P.2d 465 (App.1980); *Smith v. Mahoney,* 590 P.2d 323 (Utah 1979). Property owners are bound and often deprived of property by encumbrances shown in the real estate records. Criminals are bound and often deprived of their liberty by violations of the criminal statutes of which they had no personal knowledge. Tortfeasors are bound and often deprived of property by violations of both statutes of which they had no knowledge, and the common law which may not have been "discovered" by the courts until that case, and then perhaps on appeal. In none of these cases does procedural due process allow a defense or complaint based upon ignorance of the law or upon the government's failure to take reasonable steps to inform the public of the substance of the statutes. Accordingly, the plaintiffs in the present case cannot complain that procedural due process requires Canyon County to make reasonable efforts to inform them of the availability of the aid. The county may choose to attempt to notify those in need as to the availability of aid, and we encourage those efforts, but such notice is not mandated by either the due process clause of the fourteenth amendment of the United States Constitution or Art. 1, § 13, of the Idaho Constitution.

II.

*Eligibility standards*

The standard of eligibility for the county indigent aid program is set out in the Idaho Code:

"**31–3502. Definitions.—** ...

"(1) 'Medically indigent' means any person who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services. Nothing in this definition shall preclude the board of county commissioners from requiring medically indigent persons to reimburse the county for a portion of their medical expenses, when investigation of their application pursuant to chapters 34 and 35, title 31, Idaho Code, determines their ability to do so.

. . . .

"(6) 'Sick' means any person affected with disease or who is unable to care for himself and who does not have the means to provide for his own support, but who does not necessarily require the services of a hospital as defined in subsection (2) of this section.

"(7) 'Indigent' means any person who is destitute of property and unable to provide for the necessities of life.

. . . ."

The Canyon County ordinances in question pertaining to eligibility reflect these same standards. Plaintiffs argue that the standards are unconstitutionally overbroad and vague, leading to arbitrary interpretation of eligibility. Although plaintiffs couch their complaint and arguments in terms of "procedural due process," the alleged de-

fect has nothing to do with procedure, *i.e.*, notices, hearings, right to appeal, etc. Rather, the plaintiffs are actually complaining of a violation of so-called "substantive due process" which attacks the substance of a statute as being irrational or vague, subjecting persons to the risk of arbitrary actions by the government. *See generally* 16A Am.Jur.2d, Constitutional Laws §§ 816, 818, and cases cited therein.

Plaintiffs do not attack the I.C. § 31–3502 standards directly, which if successful would result in the statute being determined to be void for vagueness and thus unconstitutional, and which would eliminate the entire county indigency benefits program. Rather, plaintiffs attack the county ordinance which parallels the same standards enacted by the legislature, and further ask this Court to mandate the county to enact more specific standards of eligibility based upon family size, income levels, asset maximums, debts and expenses, etc. Since the standards in the county ordinance parallel the legislative standards, the ultimate issue is whether the legislature's standards are constitutionally adequate.

### A.

■■■ We hold that the legislative standards set out in I.C. § 31–3502, *infra* at 1345, are constitutionally adequate. A statute which does not infringe upon fundamental rights, as they exist within the United States Constitution or its penumbra, may pass with less specificity when faced with a constitutional challenge of being overly broad or vague. *See Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974); *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974); 16A Am.Jur.2d Constitutional Law § 818, pp. 992–993 (1979). While a valid statutory scheme requiring county aid to indigents creates a legitimate claim of entitlement to property, *see Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the entitlement to aid is not a fundamental right. Therefore, I.C. § 31–3502 does not require the greatest degree of specificity in order to with-

stand a constitutional challenge. We find the statutory language:

"[A]ny person who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services.

. . . .

"[A]ny person affected with disease or who is unable to care for himself and who does not have the means to provide for his own support, but who does not necessarily require the services of a hospital . . . .

. . . .

"[A]ny person who is destitute of property and unable to provide for the necessities of life." I.C. § 31–3502,

contains the requisite specificity in order to withstand the challenge. The language uses plain terms which are easily understood. The broadness of the language must be balanced against the loss of flexibility to indigents should more specific standards be set. Any set of specific standards based upon family size, income, assets, debts and expenses, etc., would undoubtedly be met with a claimant who does not quite fall within the standards, but should still be entitled to the indigent aid.

It is not uncommon for a legislative body to enact broad standards when granting statutory benefits. The federal district court opinion relied on by plaintiffs, *Baker-Chaput v. Cammett*, 406 F.Supp. 1134 (D.N.H.1976), dealt with a welfare statute which contained no standard. *Baker-Chaput* did note, however, that the state has an interest in enacting broad standards and that specific standards could retard the administrative process by eliminating the possibility of flexibility. An example of a broad standard in the law is the income tax deduction allowed by Congress to businesses for "ordinary and necessary" business expenses. I.R.C. § 162(a). The Internal Revenue Service administering the benefit has enacted regulations interpreting the

broad phrase. However, these regulations are not necessarily binding, *see* Chrommie, Federal Income Taxation, p. 13 (1973), and the courts are left to interpret the broad phrase based upon their determination of Congress's perceived intent as reflected in the prior case law, *see Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

An example in Idaho's statutes of a broad standard benefit is the property tax exemption for a "fraternal, benevolent, or charitable corporation or society." I.C. § 63–105C. This broad standard is also left to judicial interpretation on a case by case basis, considering the particular circumstances of each organization. *Canyon County v. Sunny Ridge Manor, Inc.*, 106 Idaho 98, 675 P.2d 813 (1984); *Coeur d'Alene Public Golf Club, Inc. v. Kootenai Board of Equalization*, 106 Idaho 104, 675 P.2d 819 (1984). Other examples are the "fair, just and reasonable" standard for setting utility rates by the Public Utilities Commission as set out in I.C. § 61–502, and the "good cause" standard which an unemployed person must show to be entitled to unemployment benefits after voluntarily quitting employment. I.C. § 72–1366(e). We find nothing unusual or invalid about a broad legislative benefit standard left to judicial interpretation. Compared to the foregoing examples, the eligibility standards for indigent aid, *ante* at 1345, are adequate to meet constitutional standards.

Accordingly we affirm the district court's judgment concluding that the standards for eligibility set out in I.C. § 31–3502 are adequate and specific enough to survive a challenge of being void for vagueness and are not a denial of due process.

## B.

■ We further rule that the remedy which plaintiffs have requested, *i.e.*, that the district court mandate the state legislature or the county commission to legislate more specific substantive eligibility criteria is not constitutionally available. The Idaho Constitution states that, "The legislative power of the state shall be vested in a senate and house of representatives," Idaho Const., Art. 3, § 1. The counties in Idaho do have authority "to make and enforce, within its limits, all such local police, sanitary and other regulations as are not in conflict with its charter or with the general laws." Idaho Const., Art. 12, § 2. However, the failure of either the state legislature or the county to enact constitutionally valid entitlement legislation does not authorize our courts to either judicially amend the statutes to make them constitutional or to compel the legislative body to do so. Any such judicial order would violate Art. 2, § 1, of the Idaho Constitution, which reads:

> "§ 1. **Departments of government.—** The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly direted or permitted."

Under the Constitution, our courts have the authority to interpret legislation or to declare unconstitutional those legislative acts which do not meet the standards of the state or federal Constitutions. *See Idaho Gold Dredging Co. v. Balderston*, 58 Idaho 692, 78 P.2d 105 (1938). However, "if the law, so interpreted [or found unconstitutional], is to be changed, that is a legislative, not a judicial, function." *In re Speer*, 53 Idaho 293, 300, 23 P.2d 239, 241 (1933) (interpreting the separation of powers doctrine in Art. 2, § 1, of the Idaho Constitution).

## III.

### *Attorney fees*

Plaintiffs stipulated that they would bear their own attorney fees for the relief

gained through the stipulated order. Plaintiffs have prevailed on no other substantial issue and therefore no award of attorney fees will be made.

This disposition makes it unnecessary to address the only issue raised on cross appeal challenging the class certification of the plaintiffs.

Affirmed. Costs to respondents.

DONALDSON, C.J., and SHEPARD, J., concur.

BISTLINE, Justice, dissenting, with whom Huntley, J., concurs.

The majority today has now withdrawn and replaced its first opinion, not responsive to our earlier dissent, but in response to concerns expressed by the Attorney General with regard to language found in the original opinion to the general effect that the powers of county governments are extremely prescribed and limited.

In the Attorney General's Petition to Intervene on Rehearing, the complaint primarily was that:

The office of the Attorney General [has been] forced to inform the Idaho Legislature that the *Powers* opinion departs so radically from prior law that it may no longer be possible to determine with certainty whether the legislature can delegate tasks to counties, while leaving any element of discretion to the counties in carrying out those tasks. The result, in each instance, has been legislative paralysis and frustration.

While the Attorney General may now be satisfied by the majority's second effort, errors involving the substantive issues of this case remain unremedied.

The conclusions of the majority are, essentially, twofold. They are (1) that due process does not require Canyon County to make good faith efforts to inform the public concerning welfare benefit eligibility standards; and (2) that the present legislative standards are not unconstitutionally vague. Neither holding is backed by sound reasoning or persuasive precedent. We therefore dissent, and submit that which should today be the opinion for the Court.

I.A.

The legislative treatment of indigent persons is found in Chapters 34, 35, and 36 of Title 31, Idaho Code. Of these, Chapter 35 sets forth both the policy and standards of the legislative treatment of indigent persons. I.C. § 31–3501 states the legislative declaration of policy as follows:

"In order to safeguard the public health, safety, and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state, and, in the case of indigent persons, to provide for the payment thereof, the respective counties of this state shall have the duties and powers as hereinafter provided."

I.C. § 31–3502, dealing with definitions, defines "medically indigent" as follows:

"(1) 'Medically indigent' means *any person* who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, *does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services.*" (Emphasis added.)

In addition, I.C. § 31–3503, dealing with the powers and duties of boards of county commissioners, states the following:

"The boards of county commissioners in their respective counties shall, under such limitations and restrictions as are prescribed by law:

"(1) *Care for and maintain the medically or otherwise indigent,* and may provide for the care of other sick persons as provided in section 31–3501, Idaho Code, ...." (Emphasis added.)

There is no definition of "indigent" or "otherwise indigent" per se, and it is appellants' contention that this deprives them of

due process under the Fourteenth Amendment of the United States Constitution.

In considering the constitutionality of the eligibility requirements for county indigence assistance, it is clear that we must look primarily to the applicable Idaho Code provisions enumerated above. This Court has previously determined that "the standard the county clerk is to apply in determining medical indigency is precisely the same as that which the district court is to use in reviewing such determination on appeal. That is to say, both the county clerk and the district court are required only to determine that the claimant is 'medically indigent' as that term was defined by the ... legislature." *University of Utah Hospital and Medical Center v. Bethke*, 98 Idaho 876, 878, 574 P.2d 1354, 1356 (1978). *See also University of Utah Hospital and Medical Center v. Eriksen*, 100 Idaho 18, 592 P.2d 430 (1979). In contrast to respondents' position that we have already had occasion in *Bethke* and *Eriksen* to consider the constitutionality of § 31–3502(1), dealing with the definition of medical indigency, it is clear that quite the opposite is in fact the case. *Bethke* and *Eriksen* dealt only with the question of which standard of indigency, as between that contained in I.C. § 31–3405, as it then read,[1] and I.C. § 31–3502, was to control. We held that the standard contained in I.C. § 31–3502 should control. Neither case dealt with the distinct and separate question of whether I.C. § 31–3502, though controlling, was valid under constitutional requirements of due process.

Before considering the merits of appellants' contention, we must note that, in *Forshee v. Board of County Commissioners of Lemhi County*, United States District Court, District of Idaho (No. 81–4021, April 8, 1983), Judge Callister considered the precise question of whether I.C. § 31–3502 denied applicants for county indigency assistance due process of law. In that case, after noting that all parties to the action agreed that the statutory scheme under the Idaho Medical Indigency Act was constitutionally deficient with regard to its statement of eligibility criteria, the District Court concluded that the Forshees were in fact "deprived of their due process rights when Lemhi County denied the Forshees' claim for benefits under the Act without having provided the Forshees with written eligibility criteria by which the Forshees' application would be judged." *Forshee, supra*, at 4. As detailed *infra*, we agree with the federal district court that the Idaho Medical Indigency Act is in violation of the plaintiffs' due process rights.

**B.**

Though "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property," *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), it is clear that the present action involves just such a property interest within the meaning of the Fourteenth Amendment. As noted above, under I.C. § 31–3503, "The boards of county commissioners in their respective counties *shall*, under such limitations and restrictions as are prescribed by law ... [c]are for and maintain the medically or otherwise indigent, ...*" (Emphasis added.) The mandatory language utilized in the authorizing statute creates a "legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements." *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir.1979). It is precisely this type of legitimate claim of entitlement which was contemplated by the United States Supreme Court in *Board of Regents v. Roth, supra*:

"Property interests, of course, are not created by the Constitution. Rather they

---

1. I.C. § 31–3405 has since been amended to delete the language which comprised the subject of the controversy in *Bethke*.

are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Id.* 408 U.S. at 577, 92 S.Ct. at 2709.

In addition, it is clear that applicants for welfare assistance in a jurisdiction providing for such assistance have a property interest in the sought-after benefits *whether or not* they in fact ultimately receive or retain them. In the watershed case of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the United States Supreme Court stated that "welfare benefits are a matter of statutory entitlement for persons qualified to receive them," and that such welfare entitlements should be considered today more like "property" than a "gratuity." *Id.* at 262, 90 S.Ct. at 1017. The Court held in *Goldberg* that the Due Process Clause thus applies to the *termination* of such welfare benefits and that procedural due process requires that the recipient be afforded an

evidentiary hearing *before* the termination of benefits. *Id.* at 264, 90 S.Ct. at 1018.[2] In *Griffeth v. Detrich, supra,* the Ninth Circuit Court of Appeals held that the Due Process Clause applies to applicants who were *initially denied* in their attempt to obtain state welfare benefits.[3] Thus, it is clear that procedural due process requirements apply to such welfare benefits in both the application and termination stages.[4] *See also Gary v. Nichols,* 447 F.Supp. 320 (D. Idaho 1978).

### Ċ.

Having agreed with the *Forshee* court that the requirements of due process apply, we must now consider precisely what process is in fact due. *Smith v. Organization of Foster Families,* 431 U.S. 816, 838–39, 847, 97 S.Ct. 2094, 2106–07, 2111, 53 L.Ed.2d 14 (1977); *Application of True,* 103 Idaho 151, 154, 645 P.2d 891, 894 (1982). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court noted that due process "is not a technical conception with a fixed content unrelated to time,

**2.** Note that, although *Goldberg v. Kelly* involved a federally assisted program and not a completely state funded program such as that in issue here, such is of no consequence with regard to the requirements which must be met in its administration. Idaho, as every other state, is required by the Fourteenth Amendment to provide due process in its laws. *See, e.g., Brooks v. Center Township,* 485 F.2d 383, 385 (7th Cir.1973).

**3.** In *Griffeth,* the court stated that "the authorizing statute coupled with the implementing regulations of the county creates a legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements." *Id.* at 121. Although I.C. § 31–3503 lacks the detailed regulations specifying objective eligibility criteria for receipt of aid present in *Griffeth,* we believe that the statute nonetheless creates a legitimate claim of entitlement in applicants such that the requirements of procedural due process properly attach. A contrary result, i.e., that the eligibility requirements are so vague as to preclude such a claim of entitlement in any applicant before his application has in fact been approved, would create the anomalous result of allowing the state and counties to avoid the strictures of procedural due process in the application stage by violating

its requirements. It is precisely this violation of due process, i.e., vague, uncertain and unpublicized eligibility requirements, which comprises the practice to which plaintiffs object.

**4.** One noted constitutional scholar has asserted that:

"[Though it] might ... be argued that there exists no due process duty to afford a hearing when the state turns down an initial request (as opposed to a renewal application) for welfare, ... it would be inconsistent with any intelligible rationale underlying due process protection to deny all procedural safeguards to the new applicant where the law provides that all individuals meeting certain objective criteria are entitled to ... welfare."

Lawrence Tribe, American Constitutional Law, p. 518–19 (1977).

Professor Tribe then notes the following:

"If the Court were to deny any protection to interests in statutory benefits not currently enjoyed, then the fear expressed by Justice Black in his dissent in *Goldberg v. Kelly,* 397 U.S. 254, 279 [90 S.Ct. 1011, 1026, 25 L.Ed.2d 287] (1970), may be borne out: a state would be tempted to delay putting a person on welfare until absolutely sure he or she was eligible, ...."

*Id.,* n. 34.

place and circumstances," but "is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334, 96 S.Ct. at 902. The *Mathews* Court further noted that three distinct factors must be considered and weighed before the specific dictates of due process may be ascertained:

"First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. We must therefore base our determination of what procedure is due under the Fourteenth Amendment on our consideration of these three factors.

First, it is clear that appellants' interest in this case is of the highest order. As, by hypothesis, we are dealing with indigent persons who are in need of relief by the state and counties in order to meet the minimum requirements and exigencies of day to day living, the stakes are high. Plaintiffs' situation in having to resort to county indigency assistance for medical and other costs may perhaps best be characterized as critical and not unlike the "brutal need" which the United States Supreme Court found to be present in *Goldberg, supra,* 397 U.S. at 262, 90 S.Ct. at 1017.

In addition, as the United States District Court for New Hampshire noted, the applicant for such benefits has other important interests as well. "[A]s a member of our society, she has an interest not only in being treated fairly by the administrative agency, but, just as important, in believing that she has been treated fairly. A standardless method of administration negates these interests." *Baker-Chaput v. Cammett,* 406 F.Supp. 1134, 1140 (D.N.H.1976). Without the presence of objective, easily applied criteria to guide those who make the initial determination, and to reassure an applicant who has been found ineligible, the applicant may well question the justice and fairness of such a process—thereby losing not only his entitlement to the welfare benefits for which he has applied, but his faith in the very government and system which has denied him. This would represent a grievous loss indeed.

Second, there is certainly a substantial risk of appellants being erroneously deprived of county indigency benefits in the present case. However, because it is unclear under the present statutory scheme precisely who is eligible for county indigency aid, i.e., who is an indigent—medical or otherwise, there is no way of determining exactly who has been *erroneously* deprived and who has been justifiably denied. This uncertainty notwithstanding, however, there is clearly a danger at present that many otherwise eligible applicants are deterred and thus "erroneously deprived" of such benefits by the uncertainty of their condition, i.e., by not knowing or being able to ascertain whether they qualify or not, and a mistrust and apathy with regard to entering the administrative process in the face of such uncertainty. In addition, there are clearly many persons in plaintiffs' position who are ignorant of the availability of such benefits and thus are "erroneously deprived" of their statutory entitlement by simply not applying.

The possibility of erroneous deprivation, however, extends to more than mere nonapplication by disenchanted and/or uninformed potential applicants. The administrators themselves—those who make the initial eligibility determinations[5]—are like-

5. Despite the possibility of appeal in the event of an initially adverse ruling on an application, it is clear that this initial stage is by far the most crucial:

"[W]e certainly cannot conclude that the opportunity for appeal is an effective check on the fairness and accuracy of even initial denials of claims for benefits or compensation. But one conclusion may be drawn: The initial

wise in danger of falling prey to inadequate standards and unwritten guidelines. "The absence of standards creates a void in which malice, vindictiveness, intolerance or prejudice can fester." *Baker-Chaput, supra*, at 1140. In addition, we need not impute evil intentions to welfare administrators to note the enhanced potential such a lack of guidelines creates for simple human error. Without written criteria to which administrators may refer their subordinates, the close cases may perchance be subject to inconsistent disposition. This, again, not only contradicts the purpose of the system, i.e., to provide care to all "medically or otherwise indigent" persons, but undermines its accuracy and fairness,[6] and thus its integrity in the eyes of those whom it was created to serve.

Third, as the United States Supreme Court noted in *Goldberg v. Kelly, supra,* the interests of the government are typically at odds with each other. In considering these disparate and often conflicting state interests, we begin by noting that it is the stated policy of the legislature to "safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state." I.C. § 31–3501. By enhancing the fairness and accuracy of the welfare application process, it is clear that the present proposals are designed to further this goal. In facilitating the relief of needy persons in this state, many other important governmental interests are promoted as well. As the Supreme Court stated in this regard in *Goldberg v. Kelly, supra,* 397 U.S. at 265, 90 S.Ct. at 1019:

"From its founding the Nation's basic committment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize

that forces not within the control of the poor contribute to their poverty. This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. *Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a wide-spread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to "promote the general Welfare, and secure the Blessings of liberty to our selves and our Posterity."* (Emphasis added.)

The Supreme Court then concluded that "[t]he same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it." *Id.* We would add that these governmental interests likewise counsel the provision of welfare to *all* those eligible to receive it in a consistent and evenhanded way.

As against this interest in carrying out the policy of its laws, the county and/or state government also has an interest in streamlining administrative procedure, avoiding unnecessary expenditure and conserving the public fisc. *Mathews v. Eldridge, supra,* 424 U.S. at 348, 96 S.Ct. at 909. In the present case, it seems clear that initially, at least, some additional administrative burden would be imposed by the changes which plaintiffs' propose. At least until the legislature or Idaho Association of Counties enact more specific guide-

---

level of adjudication is by far the most important decisional level. That decision is final in well over ninety percent of the social welfare claims filed."

Mashaw, "The Management Side of Due Process: Some Theoretical and Litigation Notes on the Assurance of Accuracy, Fairness, and Timeliness in the Adjudication of Social Welfare Claims," 59 Cornell Law Review 772, 785 (1974).

**6.** "'Accuracy' involves the correspondence of the substantive outcome of an adjudication with the true facts of the claimant's situation and with an appropriate application of the relevant legal rules to those facts. Accuracy is thus the substantive ideal; approachable but never fully attainable. 'Fairness' is the degree to which the process of making claims determinations tends to produce accurate decisions."

*Mashaw, supra,* at 774–75.

lines as to eligibility for the indigency relief programs mandated by I.C. § 31–3502 *et. seq.*, the counties themselves would be forced into the position of adopting specific and objective guidelines for such eligibility and committing the same to writing. Similarly, there would certainly be involved some incremental expense in the publication of these standards and in ensuring their availability to the public. It is against the time and expense of these proposed changes that we must balance the interests of appellants in seeing them instituted as well as the benefit on all levels which such changes would bring about.

In balancing the various interests involved, we note at the outset that "procedural due process is not intended to promote efficiency." *Fuentes v. Shevin*, 407 U.S. 67, 90 n. 22, 92 S.Ct. 1983, 1999 n. 22, 32 L.Ed.2d 556 (1972). In addition, a procedural safeguard must be afforded "if that may be done without *prohibitive* cost." *Goss v. Lopez*, 419 U.S. 565, 580, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975) (emphasis added). We further note that in considering those state interests opposed to the adoption of such procedural safeguards, the state's interest in streamlining the administration of the Act in question is insufficient to override appellants' constitutionally protected interests. *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (Burger, C.J., dissenting); *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Gilmore v. Custer*, 14 Clearinghouse Review 370 (N.D.Ind., Feb. 29, 1980). *Cf. Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972); *Baker-Chaput v. Cammett*, 406 F.Supp. 1134, 1140 (D.N.H.1976). We therefore must inquire as to whether the interests of the county in not promulgating the requested procedural safeguards outweighs those factors militating in favor of such an application.

It is our view that the expense and administrative burden required to amend these provisions to incorporate the requested changes is neither excessive nor prohibitive.[7] The promulgation of written eligibility standards involves the making of a few fundamental decisions as to the objective criteria to be considered in computing an applicant's available resources, the level of resources necessary to eliminate an applicant from consideration as an indigent, etc. —decisions which though concededly difficult, should be made at the outset.[8] Unlike the requirements set forth in *Goldberg, supra*, which clearly represented a continuing administrative burden and drain on the public fisc—and yet were nevertheless upheld as essential to due process—the passage of acceptable standards represents an essentially one-time expenditure which, once made, should require only occasional adjustment in order to meet the exigencies of a changing economic environment. Further, we note that the ultimate effect of promulgating such specific and objective written standards is clearly one of *simplifying* the decision-making process in this initial administrative stage, thereby conserving public monies and reducing the county's burden. Considering the compelling nature of plaintiffs' interest in having specific and objective written standards of eligibility, the likelihood that such standards will enhance the accuracy, fairness, reliability and consistency of the eligibility determination, and the relatively insignificant cost represented by such a procedure, due process in this instance requires objective, detailed, and specific written stan-

7. In reaching this decision we note that, in response to a question posed by Justice Huntley at oral argument, counsel for respondent Canyon County admitted that nothing imposed by Judge Callister's decision in *Forshee* would be unfair or oppressive to the County. We agree.

8. We take judicial notice, in this regard, of the fact that the Idaho Association of Counties has recently promulgated Uniform County Guidelines on Indigent Eligibility. As these guidelines are not now before us, we make no judgment as to whether they meet the requirements identified in this opinion. We comment on them only to highlight the fact of their availability and that the machinery for considering and incorporating such amendments is already in place.

dards of eligibility for county indigency aid.[9]

Although respondents argue that Idaho in fact does have written standards, we judge those standards to be deficient. I.C. § 31–3502 essentially defines "medically indigent" as pertaining to any person who "does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services." As appellants point out in their brief:

> "The ordinance gives only [a] general idea of the sort of person the program is intended to assist, without providing the specific criteria one would need to know in order to determine whether a given applicant is eligible for county assistance. The ordinance provides no budget ('need') formula, gives no indication of what resources are to be considered available to meet current needs, does not state what or how much real and personal property an applicant can retain and still be eligible for assistance, and sets no income ceilings. For example, must a person who has no income and no resources other than one recent-model automobile dispose of the automobile in order to be eligible for county assistance? Must an applicant dispose of a treasured family heirloom worth $3,000.00 before she will be granted any county assistance? At what point does an applicant become 'severely limited in resources and income'? The ordinance does not answer nor tell us how to answer these questions."

Appellants' Brief, pp. 32–33.

Such a "standard" simply invests too much discretion in the hands of those administering it and seems clearly designed to leave a rejected applicant uncertain as to the basis and propriety of his rejection. Due process demands more. We therefore agree with

9. In concluding that due process requires written, objectively-based eligibility criteria, we note our accord with other courts considering this same question. It is our view that the absence of specific objective standards leaves the administrators in the position of relying either upon their own unwritten personal standards or no standards at all. We are convinced that, in the present context, neither alternative comports with current notions of due process. As to the former, the Seventh Circuit Court of Appeals stated the following in the context of the administration of a welfare assistance program in Illinois:

> "Defendant Roughton as administrator of the general assistance program has the responsibility to administer the program to ensure the fair and consistent application of eligibility requirements. Fair and consistent application of such requirements requires that Roughton establish written standards and regulations. At the hearing in the district court on the preliminary injunction, defendant Roughton admitted that he and his staff determine eligibility based upon their own unwritten personal standards .... Such a procedure, vesting virtually unfettered discretion in Roughton and his staff, is clearly violative of due process."

> White v. Roughton, 530 F.2d 750, 754 (7th Cir.1976).

As to the latter, the Federal District Court of New Hampshire stated the following in another case dealing with the administration of a town's general assistance program:

> "The standardless administration of general assistance places the hungry and the poor at the administrator's whim and does little to foster the belief, so important in a democratic society, that justice has been served .... The applicant must be afforded the opportunity to know beforehand what substantive criteria she had to meet in order to obtain general assistance .... Without the issuance of standards, the initial reasons for denial may change and be replaced with new and differing reasons which the applicant is unable to contest. I rule that the establishment of written, objective, and ascertainable standards is an elementary and intrinsic part of due process."

> Baker-Chaput v. Cammett, 406 F.Supp. 1134, 1140 (D.N.H.1976).

See also Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir.1968) ("It hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program ... would be an intolerable invitation to abuse .... For this reason alone due process requires that selections among applicants be made in accordance with 'ascertainable standards,' ...."); Hornsby v. Allen, 326 F.2d 605, 610 (5th Cir.1964) ("The public has the right to expect its officers to observe prescribed standards and to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse.").

the U.S. District Court in *Forshee, supra,* and hold that I.C. § 31–3501 *et. seq.* deprives appellants of due process by failing to provide written detailed eligibility requirements.

However, our consideration of the applicable standards does not end simply with the language of I.C. § 31–3502. Though *Bethke* and *Eriksen* held that the legislative definition of I.C. § 31–3502 was to control over the language contained in I.C. § 31–3405, we note that the legislative prescription and, we believe, intent in this area has changed somewhat in the interim. Indeed, the *Bethke* court noted, even as it announced its holding, that its decision was limited only to cases arising under the 1974 amendments. *Bethke, supra,* 98 Idaho at 879, n. 1, 574 P.2d at 1357, n. 1.

Since 1974, however, the legislature has amended the Medical Indigency Act in several significant respects. First, in 1983, the legislature amended I.C. § 31–3503, dealing with the powers and duties of boards of county commissioners, was amended to provide as follows:

"The boards of county commissioners in their respective counties shall, under such limitations and restrictions as are prescribed by law:

. . . .

"(3) Participate in the catastrophic health care costs program established pursuant to this chapter and operate the program in accordance with the uniform county guidelines on indigent eligibility and all procedures contained therein as adopted by the counties, collectively . . . ."

Second, I.C. § 31–3502, dealing with definitions, was amended in 1982 to include the following provision:

"(11) 'Recipient' means an individual determined eligible for county medical assistance under uniform county guidelines on indigent eligibility adopted by the administrator pursuant to law."

Third, the 1982 amendments provided for the addition of a new chapter, Chapter A35, Title 31, Idaho Code, which provides in pertinent part as follows:

"31–A3504. Advisory decisions of panel. The general responsibility of the advisory panel will be to consider the eligibility of applicants on claims referred to them and render written opinions regarding such eligibility of applicants as based upon review of analysis of the resources available to the applicant, as defined in the Uniform County Guidelines on Indigent Eligibility referred to in section 31–3502, Idaho Code . . . ."

It is our view, based upon these extensive amendments, each of which contemplates the supplementation of The Medical Indigency Act by standards, definitions, etc., contained in the Idaho Association of Counties' Uniform County Guidelines on Indigent Eligibility, that the legislature intended its own definition of indigency and medical indigency, contained in I.C. §§ 31–3502(7) and (1), respectively, also to be so supplemented. We are buttressed in our determination by the *Forshee* decision, wherein Judge Callister stated the following:

"It also appears that the Act contemplates uniform state-wide guidelines for eligibility criteria rather than a patchwork system of separate guidelines for each county. Indeed, the state legislature, through Idaho Code § 31–3503(3), has apparently delegated to the Idaho Association of Counties the power to determine the specific eligibility criteria under the catastrophic health care provisions of the Act."

*Forshee, supra,* at 5.

We therefore hold that it was intended that the counties would supplement the definition of medical indigency contained in I.C. § 31–3502 by duly promulgated standards agreed upon by the Idaho Association of Counties and applied statewide. We likewise hold that any future consideration of the legislative language must also incorporate by reference definitions and regulations of the Uniform County Guidelines on Indigent Eligibility as adopted by the Idaho Association of Counties and the various counties.

In the present case, Canyon County Ordinance No. 81–003 essentially adopted in its entirety the September 21, 1979, (first) edition of the Uniform County Guidelines on Indigent Eligibility.[10] These guidelines, however, merely reiterate in circuitous fashion the definitions contained in I.C. § 31–3502. In addition, the Canyon County guidelines state that "the applicant must meet the specific conditions of eligibility set forth in this manual of guidelines." Canyon County Ordinance No. 81–002, p. 6. However, though specifying the resources of the applicant to be considered in the determination, and detailing the nature of the application, the Ordinance provides little insight into the actual criteria used by welfare administrators in their determinations of eligibility.[11] We therefore hold that, even when supplemented by Uniform County Guidelines on Indigent Eligibility, I.C. § 31–3502, et seq., fails to meet the requirements which we have held that due process demands.

Similarly, we note that the administrative burden and cost to the government associated with providing notice [12] of the availability of county indigent benefits is not sufficient to override plaintiffs' interest in having such notice required. The provision of notice need not be an expensive undertaking. Publication in the offices with which indigents may be expected to have some contact, i.e., hospital admitting offices, social security, county aid, etc., and occasional public service notices in the various media are neither prohibitively expensive nor administratively burdensome. We hold that due process in this regard requires no more and no less than good faith efforts reasonably calculated [13] to bring the availability of legislatively mandated county aid benefits to the attention of those eligible to receive them.[14]

---

**10.** As we noted *supra,* at p. 1353, n. 8, the Idaho Association of Counties has recently adopted a fourth edition of the Uniform County Guidelines which is not now before us.

**11.** The Ordinance attempts to define its eligibility standards with some particularity only with regard to its qualifications for assistance with physicians' services, wherein the following is stated:

"4. In order to be eligible for physicians' services, an applicant must be financially unable to pay for examination, medical or surgical. Financial eligibility is affected by the patient's own resources and by other resources available to him. Need shall be considered to exist when the estimated cost of medical care exceeds available resources, both personal and community. Personal resources shall include not only income, savings, personal insurance and property of members of the household, but also anticipated earnings. Community resources may consist of State or Federal Agencies or Service organizations."

Canyon County Ordinance No. 81–003, p. 17. Although this rough "formula" is somewhat more "detailed" than that found in I.C. § 31–3502, it nonetheless fails to answer the type of questions raised by appellant, *supra,* and fails to meet the minimum requirements identified in this opinion as being within the ambit of due process of law.

**12.** Although the word "notice," as used here, expands somewhat the conventional use of the term as it generally appears in the context of judicial proceedings, we find it to be none-

theless appropriate. In fact, as we conceive them, both the issues of publication *and* written eligibility requirements are essentially issues of notice. In our judgment, the issues at hand may be reduced to whether or not due process requires that a person have reasonable opportunity to know of the rights and procedures to which he is entitled and the standards by which he shall be judged throughout those proceedings. This is notice in its purest form.

**13.** "At the core of the procedural due process right is the guarantee of an opportunity to be heard and its corollary, a promise of prior notice. The constitutionality of a particular notice mechanism is not to be judged by its actual success—whether an individual or group is in fact notified—but turns instead on whether the chosen method is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. See, e.g., *Morgan v. United States,* 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129] (1938).'"

Tribe, American Constitutional Law, p. 550–51.

**14.** In so ruling, we note our accord with the *Forshee* court's order of "conspicuous public posting of notice of county benefits under the Idaho Medical Indigency statutes." As stated by the United States District Court for the Northern District of Indiana in its consideration of the procedural due process requirements associated with the Indiana Hospital Commitment Act, Ind.Code §§ 12–5–1–1 *et seq.:*

"Notice that benefits under the Act are available is basic. Those eligible under the

## II.

We must now consider the nature of the remedy to be applied. As the District Court in *Forshee* noted, fashioning a remedy in such a case is a "very difficult task." Although we have held that due process requires procedural safeguards not presently provided for within the letter of the statute, we note that Idaho invests such legislative pronouncements with a strong presumption of constitutionality, *State v. Rawson*, 100 Idaho 308, 597 P.2d 31 (1979), and that a statute must be construed in a constitutional sense whenever reasonable and practical to do so. *State ex rel. Kidwell v. U.S. Marketing, Inc.*, 102 Idaho 451, 631 P.2d 622 (1981).

In the present case it is clear that the legislative intent of the statute is in no way inconsistent with our holding today. As noted above, the stated policy of the Act is to "safeguard the public health, safety and welfare, and to provide suitable facilities and provisions for the care and hospitalization of persons in this state, and, in the case of indigent persons, to provide for the payment thereof ...." I.C. § 31–3501. Therefore, as the District Court noted in *Gilmore v. Custer, supra:*

> "Implementation of the procedures demanded by plaintiff would be fully consistent with what was obviously the goal of the ... legislature in enacting the Act, to provide medical, hospital and surgical care for those persons ... who are without means to provide such services for themselves. Therefore, even if the procedures the plaintiffs demand are constitutionally mandated, [the challenged] sections are not invalid on their face."

Our objections to the legislation as it presently stands are not in what it says— the Act is constitutionally acceptable insofar as it goes—but rather with what we have identified as its omissions. However,

Act are completely helpless to protect their rights if they are not even aware that aid is available."
*Gilmore v. Custer*, 14 Clearinghouse Review 370 (N.D.Ind., Feb. 29, 1980).
This Court likewise considers notice of one's rights essential to due process. Notice is the

in view of our holding today that The Medical Indigency Act was intended to incorporate by reference the definitions and regulations for the approved Uniform County Guidelines on Indigent Eligibility, we further hold that such omissions may be cured by appropriate additions to the uniform guidelines. Accordingly, to invalidate the present Act would not only be counterproductive but unnecessary under the circumstances. However, until such time as these guidelines are promulgated consistently with the direction of this opinion and adopted as the rule of this state, the district court should direct Canyon County to adopt with all possible dispatch guidelines and publication procedures consistent with the dictates of due process as interpreted in this opinion.

prerequisite without which all other rights are rendered useless. All the procedural safeguards and substantive rights in the world are of no avail if those who were intended to be protected and benefited therefrom are ignorant of their availability.